## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KARL FUGATE, | : | |
| | : | |
| Petitioner-Appellee, | : | |
| | : | Case No. 21-4025 |
| v. | : | |
| | : | |
| RONALD ERDOS, et al., | : | |
| | : | |
| Defendant-Appellant. | : | |

On Appeal from the United States District Court
for the Southern District of Ohio, Western Division

---

### BRIEF OF DEFENDANT-APPELLANT

---

DAVE YOST
Ohio Attorney General

CHARLES A. SCHNEIDER (0005821)
THOMAS E. MADDEN (0077069)
Assistant Attorney General
Criminal Justice Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
(614) 644-7233/Fax (866) 523-8127
Charles.Schneider@OhioAGO.gov

Counsel for Defendant-Appellant

## __TABLE OF CONTENTS__

TABLE OF CONTENTS.........................................................................ii

TABLE OF AUTHORITIES ................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ................................x

JURISDICTIONAL STATEMENT .........................................................1

I.　INTRODUCTION ...........................................................................2

II.　PROCEDURAL HISTORY ............................................................3

　　A.　The Facts .................................................................................3

III.　SUMMARY OF THE ARGUMENT ...............................................9

IV.　ARGUMENT...................................................................................13

　　1.　THE DISTRICT COURT ERRED IN DENYING WARDEN
　　　　ERDOS' MOTION FOR SUMMARY JUDGMENT ........................13

　　A.　STANDARD ...........................................................................13

　　B.　MERITS ...................................................................................15

　　　　1.　The District Court erred in denying Warden Erdos
　　　　　　summary judgment as to his Fourth Amendment
　　　　　　claim...............................................................................17

　　　　　　a.　The scope, manner, and location of Fugate's
　　　　　　　　search favors Warden Erdos.................................20

　　　　　　b.　The District Court failed to give deference
　　　　　　　　to Warden Erdos' judgment .................................25

c.    Fugate's searches were reasonably related
to a legitimate penological interests by
weighing the need against the invasion................28

2.    The District Court erred in denying Defendant
Erdos summary judgment as to Fugate's Eighth
Amendment claims .........................................................31

a.    Warden Erdos is entitled to Qualified
Immunity .............................................................37

i.    No clearly established law that put
Warden Erdos on notice that he was
violating the Fourth Amendment..............38

ii.    No clearly established law that put
Warden Erdos on notice that he was
violating the Eighth Amendment..............42

CONCLUSION....................................................................................48

CERTIFICATE OF COMPLIANCE....................................................................49

CERTIFICATE OF SERVICE ...............................................................49

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allah v. Al-Hafeez*,
226 F.3d 247 (3rd Cir. 2000) ...............................................................47

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................13, 14

*Ashcroft v. al-Kid*,
563 U.S. 731 (2011)..................................................................37, 41, 42

*Bell v. Wolfish*,
441 U.S. 520 (1979)..............................................................18, 27, 28

*Block v. Rutherford*,
468 U.S. 576 (1984)..........................................................................20

*Burley v. Gagacki*,
729 F.3d 610 (6th Cir. 2013) ...........................................................24

*Carey v. Piphus*,
435 U.S. 247 (1978)..........................................................................47

*Celotex Corp. v. Catren*,
477 U.S. 317 (1986)..........................................................................13

*Cornwell v. Dahlberg*,
963 F.2d 912 (6th Cir. 1992) ...........................................................32

*Cornwell v. Dalberg*,
963 F.3d 912 (1992)..........................................................................29

*District Attorney's Office For Third Judicial Dist. v. Osborne*,
557 U.S. 52 (2009)............................................................................15

*Dufrin v. Spreen*,
712 F.2d 1084 (6th Cir. 1983) .........................................................39

*EEOC v. Ford Motor Corp.*,
782 F.3d 753 (6th Cir. 2015) (*en banc*)..........................................36

*Elliott v. Lynn*,
    38 F.3d 188 (5th Cir. 1994) .......................................................16, 20

*Farmer v. Brennan*,
    511 U.S. 825 (1994)...........................................................................16

*Farrar v. Hobby*,
    506 U.S. 103 (1992)...........................................................................43

*Florence v. Bd. of Chosen Freeholders*,
    556 U.S. 318 (2012)...................................................................*passim*

*Fortner v. Thomas*,
    983 F.3d 1024 (11th Cir. 1993) .......................................................17

*Gallagher v. C.H. Worldwide, Inc.*,
    567 F.3d 263 (6th Cir. 2009) ...........................................................14

*Geiger v. Jowers*,
    404 F.3d 371 (5th Cir. 2005) .....................................................44, 47

*Hanrahan v. Mohr*,
    905 F.3d 947 (6th Cir. 2018) .....................................................16, 17

*Henry v. Hulett*,
    969 F.3d 769 (7th Cir. 2020) (*en banc*) ...........................................19

*Hoever v. Marks*,
    993 F.3d 1353 (11th Cir. 2021) (*en banc*) .................................45, 46

*Hollis v. Erdos*,
    480 F.Supp.3d 823 (S.D. Ohio 2020) ..............................................30

*Hudson v. McMillon*,
    503 U.S. 1 (1992)......................................................................42, 43

*Hudson v. Palmer*,
    468 U.S. 517 (1984)...................................................................*passim*

*Johnson v. California*,
    543 U.S. 499 (2005).........................................................................16

*Johnson v. Moseley*,
    790 F.3d 649 (6th Cir. 2015) ...............................................................36

*King v. McCarthy*,
    781 F.3d 252 (7th Cir. 2015) (*en banc*) .............................................32

*King v. Zamiara*,
    788 F.3d 207, 212-213 (6th Cir. 2015) ................................................44

*Kisela v. Hughes*,
    138 S.Ct. 1148 (2018).................................................................*passim*

*Liner v. Goord*,
    196 F.3d 132 (2nd Cir. 1999) ..............................................................44

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................14

*Meachum v. Fano*,
    427 U.S. 215 (1976)..............................................................................16

*Memphis Cmty Sch. Dist. v. Stachura*,
    477 U.S. 299 (1986)..............................................................................47

*Minneci v. Pollard*,
    556 U.S. 118 (2012)..............................................................................45

*Mullenix v. Luna*,
    136 S.Ct. 305 (2015).................................................................36, 37, 41

*Ohio Civil Service Employees Assoc. v. Seiter*,
    858 F.3d 455 (6th Cir. 2019) ...............................................................42

*Oliver v. Keller*,
    289 F.3d 623 (9th Cir. 2002) ...............................................................44

*Parkell v. Danberg*,
    833 F.3d 313 (3rd Cir. 2016) ..........................................................32, 34

*Pearce v. Faurecia Exhaust Sys., Inc.*,
    529 Fed..App'x 454, 458 (6th Cir. 2013) ............................................14

*Phelps v. Coy*,
    286 F.3d 295 (6th Cir. 2002) ............................................................... 32

*Pierce v. Ohio Dept. of Rehab. and Corr.*,
    284 F.Supp.2d 811 (N.D. Ohio 2003) .................................................. 14

*Pineda v. Hamilton Cty.*,
    977 F.3d 483 (6th Cir. 2020) ............................................................... 24

*Reich v. City of Elizabethtown*,
    945 F.3d 968 (6th Cir.) ........................................................................ 13

*Reichie v. Howards*,
    132 S.Ct. 2088 (2012) .......................................................................... 36

*Reilly v. Vadlamudi*,
    680 F.3d 617 (6th Cir. 2012) ............................................................... 41

*Rhinehart v. Scutt*,
    894 F.3d 721 (6th Cir. 2018) ............................................................... 31

*Riccardo v. Rausch*,
    375 F.3d 521 (7th Cir. 2004) ............................................................... 16

*Ross v. Blake*,
    136 S.Ct. 1850 (2016) .......................................................................... 47

*Royal v. Kautzky*,
    375 F.3d 720 (8th Cir. 2004) ........................................................ 47, 48

*Rutter v. Harden-Bey*
    524 F.3d 789, 795 (6th Cir. 2008) ................................................ 44, 46

*Searles v. Van Bebber*,
    251 F.3d 869 (10th Cir. 2001) ............................................................. 47

*Sigley v. City of Parma Heights*,
    437 F.3d 527 (6th Cir. 2006) ............................................................... 13

*Stoudemire v. Mich. Dep't of Corr.*,
    705 F.3d 560 (6th Cir. 2013) ....................................................... *passim*

*Sumpter v. Wayne Cty.*,
  868 F.3d 473 (6th Cir. 2017) ........................................................................*passim*

*Turner v. Safley*,
  482 U.S. 78 (1987)............................................................................17

*United States v. Hathorn*,
  920 F.3d 982 (5th Cir. 2019) ..............................................................29

*United States v. Ron Pair Enterprises, Inc.*,
  489 U.S. 235 (1989)..........................................................................44

*Uzegbunam v. Prezewski*,
  141 S.Ct. 792 (2021)..........................................................................44

*Vincent v. City of Sulphur*,
  805 F.3d 543 (5th Cir. 2015) ..............................................................37

*White v. Pauly*,
  137 S.Ct. 548 (2017)..........................................................................37

*Whitley v. Albers*,
  475 U.S. 312 (1986)..........................................................................32

*Wilkerson v. Utah*,
  99 U.S. 130 (1878)............................................................................31

*Wilkins v. Gaddy*,
  559 U.S. 34 (2010)........................................................................42, 43

*Wilkinson v. Austin*,
  545 U.S. 209 (2005)..........................................................................15

*Williams v. City of Cleveland*,
  771 F.3d 945 (6th Cir. 2014) ..........................................................38, 41

*Williams v. City of Cleveland*,
  907 F.3d 924 (6th Cir. 2018) ......................................................23, 30, 40

*Wilson v. Seiter*,
  501 U.S. 294 (1991)..........................................................................31

*Woodford v. Ngo*,
    584 U.S. 81 (2006).............................................................................................16

*Yaacov v. Collins*,
    2010 U.S. App. LEXIS 27719 (6th Cir. 2010)....................................................44

**Statutes, Codes & Rules**

28 U.S.C. § 1291 ...............................................................................................1

42 U.S.C. § 1983 ........................................................................................1, 7, 45

42 U.S.C. § 1997e(e)..............................................................................43, 45, 48

Fed. R. Civ. P. 56(a)..............................................................................................13

Fed. R. Civ. P. 56(c)..............................................................................................13

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Defendant-Appellant believes that oral argument would assist the Court in addressing the issues presented in this case.

## <u>JURISDICTIONAL STATEMENT</u>

This is an interlocutory appeal filed by Appellant/Defendant Warden Ronald Erdos ("Warden Erdos") from an action arising under 42 U.S.C. § 1983. The District Court denied Appellant's Motion for Summary Judgment as to Appellee/Plaintiff's ("Fugate") claim that Warden Erdos violated his Fourth Amendment right to be from unreasonable searches and seizures and an Eighth Amendment right to be free of cruel and unusual punishment arising from thrice daily searches of Fugate ordered by Warden Erdos. This Court has Appellate Jurisdiction pursuant to 28 U.S.C. § 1291.

## I.    INTRODUCTION

Appellant Ronald Erdos (hereafter "Warden Erdos" or "Erdos") is the Warden at the Southern Ohio Correctional Facility ("SOCF"), a maximum-security facility, that houses many of Ohio's most dangerous inmates. Appellee (hereafter "Fugate") is one of those dangerous inmates, and was housed at SOCF at the time of the events giving rise to this case. At SOCF, Plaintiff admittedly attacked a hearing officer during an administrative hearing where his security status was being reviewed for a recent assault of another inmate. Plaintiff managed to strike the hearing officer, cutting his left cheek, and a weapon was found at the scene of the incident.   His reported motive was to obtain a transfer to the Ohio State Penitentiary ("OSP")—ODRC's highest security prison.   He was taken to J1 (restrictive housing) at SOCF and placed in a "slammer" cell. Concerned for the safety of both inmates and staff, due to Plaintiff's pattern of aggressive behavior, Defendant Erdos reasonably ordered that Plaintiff's cell be searched, necessarily requiring he be strip-searched, every day during each of SOCF staffs' three shifts for weapons and contraband. This order was carried out for thirty (30) days based on Warden Erdos' legitimate belief that Plaintiff may attack yet another person in a drastic attempt to obtain the transfer to OSP he so desperately sought.   Defendant Erdos' concerns were never malicious, nor sadistic.   Rather Erdos' concerns were based on legitimate security concerns, and clearly outweighed Fugate's limited

2

privacy rights. Thus, Warden Erdos was entitled to summary judgment on the merits, and the District Court further erred in denying his request for qualified immunity.

## II.    PROCEDURAL HISTORY

### A.    <u>THE FACTS</u>

On January 17, 2017, Plaintiff was housed at SOCF due to his recent assault on another inmate, Inmate Fugate was in the Rules Infraction Board ("RIB") area of J Block on that day for a classification review before Hearing Officer Anderson and Correction Specialist Nolan. (R. 61-8, Nolan dec., ¶ 3; PageID# 607.)  Fugate was handcuffed when he entered the hearing room. (09/24/2020 Entry, Video, 026-17c, 11:24.18.) At the hearing, Hearing Officer Michael Anderson advised Plaintiff that his security status was not being raised to level 5, but rather, he was to remain a level 4B. (R. 61-8, Nolan dec., ¶3; PageID# 607.)   Fugate responded "that's wrong, I should be going to 5B." (R. 61-8, Nolan, ¶ 3; PageID# 607; R. 61-7, Ex. H, McCoy dec.,¶ 3; PageID# 605; R. 61-6, Fri. dec. ¶3; PageID# 603.)   Mr. Anderson advised Plaintiff that he could go back to his cell. (R. 61-8, Nolan dec., ¶5; PageID# 607)  As Mr. Anderson was writing refused to sign, Plaintiff lunged across the desk and struck Anderson in the face (left cheek). (R. 61-8, Nolan, ¶4; PageID# 607; R. 605, McCoy, ¶ 4; PageID# 605; R. 61-6, Fri dec. ¶4; PageID# 603.)   Corrections Officers Fri and McCoy grabbed Plaintiff and eventually

3

subdued him. (R. 61-8, Nolan, ¶5; PageID# 608; R. 61-7, McCoy, ¶5; PageID# 606; R. 61-6, Fri. Dec. ¶6; PageID# 603.) Anderson suffered a laceration on his left cheek from the attack. (R. 61-8, Nolan, ¶ 9; PageID# 608.)  Fugate acknowledged that he was able to get "loose" from one handcuff bracelet, while the other was "hanging loose[.]" (R. 78-1, Fugate depo; PageID# 1142.)

During his deposition, Fugate admitted he had purportedly "been beefing [with Anderson] for a long time." (R. 78-1, Fugate depo; PageID# 1137.) According Fugate, "I had already had it planned in my mind that the next time I [saw Anderson] and I didn't have cuffs on I was going to assault him… and, that's what I did. Assault him." (R. 78-1, PageID# 1138.)  Fugate freely admitted he both pre-planned and intentionally assaulted Anderson. (R. 78-1, PageID# 1139.) At the infirmary, Fugate told the treating nurse, "I wanted to go to OSP." (R. 61-3, UofF Rpt; PageID# 561.)  Fugate further admitted to the recent "assault on [an] inmate," which led to his hearing. (R. 78-1, Fugate, depo., p. 7; PageID# 1138.)  Fugate stated "the one inmate assault had just happened, you know, just a week" prior to his assault on Anderson. (R. 78-1, Fugate depo. p. 58; PageID# 1189.)  Fugate freely admitted "I didn't have no beef with him or anything like that… it was on me to take him out, so I did." (R. 78-1, Fugate depo. p. 59; PageID# 1190.)

Officer Cooper responded to the incident after it was over, and noticed Anderson's cut on his face. (R. 61-12, Cooper dec. ¶3; PageID# 615.)  Later,

Officer Cooper was asked to search for any weapons at the scene of the incident, which was in disarray given the struggle, and found a flattened piece of a battery case. (*Id*, ¶ 3,4; PageID# 615.)  The battery case was sharpened to an edge. (*Id*., ¶4; PageID# 615.)  The battery case was located in the center of the desk Anderson and Nolan were sitting during the hearing. (*Id*; PageID# 615.)  Fugate admitted to using a "little piece of metal" as a weapon during the attack. (R. 78-1, Fugate depo.; PageID# 1195.)

Shortly thereafter, Warden Erdos was informed that Fugate assaulted Anderson, and a weapon was found— the flattened piece of a battery case. (R. 61-4,  Erdos, ¶3; PageID# 596; R. 61-12, Cooper, ¶4; PageID# 615.) Erdos was also informed that Fugate was at the hearing because he recently assaulted another inmate. (*Id.* ¶5; PageID# 596.) Warden Erdos was advised that Fugate was upset because Anderson had refused to increase his security status, which would have resulted in his transfer to OSP. (*Id.* at ¶6; PageID# 596.)

Due to security concerns, Warden Erdos ordered Captain Whitman "to advise staff that [Fugate] was be searched every shift".  (R. 61-4; Erdos ¶10; PageID# 597.)  Captain Whitman then sent an email to certain staff stating "Per Warden Erdos Inmate Fugate is to be shookdown at the beginning of every shift!!!" (R. 54-1, Whitman email; PageID# 281.)  Given that Fugate had recently attacked an inmate and a member of staff in an effort to obtain a transfer to OSP,

Warden Erdos reasonably believed Fugate to be particularly dangerous. (R. 61-4, Erdos, ¶9 & 10; PageID# 597.)  Because guards conduct their searches of inmates early in their shift, Warden Erdos was concerned Fugate might be smuggled a weapon by an inmate porter near the end of second shift. (R. 61-4, Erdos, ¶10; PageID# 597.)  Thus, Warden Erdos ordered Fugate to also be searched on third shift. (*Id*.) Based on concerns over Fugate's propensity for violence, Fugate's cell was searched, and he was personally searched, every shift for thirty days. (R. 61-4, Erdos, ¶11; PageID# 597.) Eventually, Fugate was transferred to OSP. (R. 61-4, Erdos, ¶12; PageID# 597.)

Inmates who are deemed most dangerous at SOCF are housed in the J1 area. (R. 61-4, Erdos, ¶6; PageID# 596.) Because Fugate was housed in J1, under post-orders, he was subject to unplanned cell searches by staff. (*Id*; PageID# 596.) Under post-orders at the time, every inmate housed in slammer cells (cell 11-15), or the double cell (cell 5), had to be searched every day during first and second shift. (R. 61-4, Erdos, ¶7; PageID# 597.) These cells are reserved for inmates determined to be the most dangerous to staff and other inmates. (*Id*; PageID# 597.)

At J1, guards conduct these searches in the following manner: First they open the gate to the corridor outside the cells, and walk to the cell of the inmate intended to be searched. The guard then orders the inmate to cuff-up, where the inmate turns his back to the cuff-port and allows himself to be cuffed. After cuffing

6

the inmate, the guard then leaves the corridor, through the gate, which is then shut, and the cell door is electronically opened. The inmate is then ordered to the shower, where he was secured, and then strip searched. The guard then walks to the opened cell where he conducts a search of the cell. After the cell is searched, the guard leaves the corridor, and the inmate (handcuffed) is allowed to walk back to his cell from the shower, where the cell door is then closed. The guard then walks to the front of the cell, and takes off the restraints from the cuff-port in the door. (R. 61-4, Erdos, ¶8; PageID# 597; R. 66-2, Whitman, ¶6; PageID# 1049.)

Furthermore, no inmates are present, or can view, inside the showers. (R. 66-02, Whitman dec. ¶5, PageID# 1049). Fugate admitted the process as "they would come there, one at a time, get a shower, strip you out, tear the cell up, come back." (R. 78-1, PageID# 1197.)  Fugate denied that these searches were conducted before other inmates. (R. 78-1, PageID# 1197.) Per Fugate, an officer would search him, while a supervisor observed. (R. 78-1, PageID# 1192.) Fugate admitted that a strip-search had to be conducted before a supervisor—"white shirt." (R. 78-1, PageID# 1192, 1200.)  According to Fugate, both his cell and his body was searched at the beginning of every shift—all three shifts. (R. 78-1, PageID# 1191-92, 1196-97, 1199-1200, 1203.)  Fugate confirmed that these searches "went on for approximately 30 days[.]" (R. 78-1, PageID# 1202.)

Plaintiff, Karl Fugate, filed a complaint on February 14, 2019, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated by Defendant Erdos and five other ODRC employees. Plaintiff admitted he assaulted "unit staff," which led to the events giving rise to this case. (Doc. 3, Complaint, PageID# 40.) Per Plaintiff, for the next thirty (30) days following his assault on a staff member, he was taken out of his cell three times a day, taken to the shower, and stripped searched. (*Id*., PageID# 47.)  His cell was then searched. (*Id*.)  He was told by staff that Warden Erdos had issued an order that this be done. (*Id*.)   According to Plaintiff, he was searched every shift, for thirty (30) days. (*Id*.)  Plaintiff claims these searches were conducted for "punitive action." (*Id*.) Plaintiff sought both injunctive relief and money damages. (*Id*, PageID# 50.)

After conducting discovery, Appellant-Erdos filed-motion for summary judgment as to the merits, and also raised qualified immunity. (R. 61, JSJ; PageID# 482.)   The Magistrate Judge recommended that Warden Erdos' motion for summary judgment be denied on the merits, and also recommended that Erdos be denied qualified immunity. (Doc. 80, R&R; PageID# 1234.)   After Erdos filed objections, the District Court, after analyzing the claims, denied Erdos' motion for summary judgment. (Doc. 89, Dist. Crt. Order; PageID# 1331.)   Thereafter, Warden Erdos filed this interlocutory appeal. (Doc. 90, Notice of Appeal; PageID# 1346.)

## III.    SUMMARY OF THE ARGUMENT

Warden Erdos oversaw the Southern Ohio Correctional Facility ("SOCF") which houses some of Ohio's most dangerous inmates, where violence is expected and common.  After Inmate Fugate attacked an inmate and a hearing officer (both with weapons), within a week, Warden Erdos, in an effort to promote security, ordered that Fugate's cell be "shook-down" three times a day.  Thus, during all three shifts (for thirty days) Fugate was removed from his cell, directed to the showers, visually strip-searched, his cell was then searched, and then he was permitted to return to his cell fully clothed.  Because of Fugate's proclivity to violence, and his reported desire to be transferred to another prison, Warden Erdos made the executive decision (to prevent future acts of violence) that Fugate be searched thrice daily.  Warden Erdos had legitimate penological concerns for ordering the searches, and it was not an exaggerated response that can or should be second-guessed by the courts.

Ordering thrice daily searches on Fugate Inmate did not violate his Fourth Amendment rights.  In prison, Fourth Amendment rights are extremely circumvented.  In fact, it is well settled, that an inmate's cell has no Fourth Amendment protections.  Furthermore, an inmate can be strip-searched so long as there is penological justification for the search.  In this case, Fugate had attacked both an inmate and staff in a very short period of time, with weapons, and Warden

9

Erdos had a reasonable concern that he may attack someone else in an attempt to get a transfer to another prison—information brought to Warden Erdos' attention shortly after the incident. The circumstances and manner of the search favors Warden Erdos. The strip-searches was conducted in the shower by male staff members, who were responsible for conducting the searches, and not in full view of other inmates. Furthermore, the District Court was not permitted to hold Warden Erdos liable for the actions of his subordinates. The lawsuit against Warden Erdos focuses on the fact that Erdos ordered thrice daily searches, not the manner they were conducted by non-parties. Furthermore, the District Court failed to give sufficient deference to Warden's Erdos' in-the-moment decision to prevent Fugate from hurting anyone else. Therefore, the searches were reasonably related a legitimate penological interest that outweighed Fugate's expectation of privacy while incarcerated. Deterring and preventing contraband is a legitimate penological concern. Furthermore, Fugate's recent episodes of violence weighed strongly in favor of conducting the searches. Also, having just recently conducted two acts of violence, with weapons, Fugate's expectation of privacy was diminished significantly.

The District Court erred in denying summary judgment to Warden Erdos on his Eighth Amendment claim. To show an Eighth Amendment violation, Fugate must prove that Warden Erdos acted both maliciously and sadistically when he

ordered that Fugate be searched thrice-daily for thirty days, and not in an effort to maintain security.  Again, the searches were justified by Fugate's acts of violence. Erdos' alleged conversation with Fugate, when Erdos notified Fugate that he was not being transferred to another prison did not demonstrate malicious and sadistic motive.  Furthermore, any alleged threats made by Erdos only showed his genuine concern that Fugate will act out again.

As to the Fourth Amendment claim the District Court erred in denying Warden Erdos qualified immunity.  The District Court reliance of *Stoudemire* was misplaced.  *Stoudemire* involved an inmate that was strip-searched, for little or no reason, in in full view of other inmates.  In the present case, Warden Erdos reasonably decided to have Fugate's cell and body searched three times a day after Fugate committed two acts of violence, both involving weapons.  Furthermore, these searches were conducted in the shower.  Moreover, *Sumpter* explains that in Fourth Amendment cases, where a balancing test is utilized, qualified immunity proves to be an even bigger obstacle to overcome.  Because Fugate was searched by staff assigned the task of searching him and his cell, as opposed to having his nakedness exposed to other inmates or female guards, there is no clearly established law that put Warden Erdos on notice that his conduct was unlawful.

As to the Eighth Amendment claim, the District Court erred in denying Warden Erdos qualified immunity.  First, the District Court failed to cite any

caselaw that would have placed Warden Erdos on notice that his conduct established malicious and sadistic conduct. Thus, the District Court erred in in being to general when defining clearly established law. Secondly, there is no clearly established law where there is no physical injury, 1997e(e) of the PLRA fails to bar mental and emotional damages for non-physical injuries for alleged Eighth Amendment violations.  In fact, *Rutter v. Harden-Bey*, strongly suggests otherwise.  Had Congress wanted to make an exception for 1997e(e) as to constitutional claims, the statutory language would have made that clear. Furthermore, *King v. Zamaria* involved a First Amendment retaliation claim, and does not reach as far as the District Court suggested.  Furthermore, *Zamaria* confirms that 1997e(e) bars damages for mental and emotional injuries for constitutional claims absent physical injuries.

## IV. ARGUMENT

1. **THE DISTRICT COURT ERRED IN DENYING WARDEN ERDOS' MOTION FOR SUMMARY JUDGMENT**

   **A. STANDARD.**

The denial of summary judgment is reviewed on appeal under a *de novo* standard, applying the same summary judgment standard as the district court. *Sigley v. City of Parma Heights*, 437 F.3d 527, 532 (6th Cir. 2006). The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(a), which provides: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, on the which the party will bear the burden of proof at trial." *Celotex Corp. v. Catren*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A moving party initially must show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp*. 477 U.S. at 325. "All *reasonable* inferences are drawn in favor" of the non-moving party, but only "to the extent supported by the record." *Reich v. City of Elizabethtown*, 945 F.3d 968, 980 (6th Cir.) The non-moving party must

then set forth specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on mere allegations or denials of his pleadings, but must present "significant probative evidence in support of his complaint to defeat the motion for summary judgment." *Anderson,* 477 U.S. at 248. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *Pierce v. Ohio Dept. of Rehab. and Corr.,* 284 F.Supp.2d 811, 822, (N.D. Ohio 2003)  Additionally, "[t]he mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party." *Anderson,* 477 U.S. at 252. A "factual dispute concerns a 'material' fact if its resolution might affect the outcome of the suit under the governing substantive law." *Gallagher v. C.H. Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009).  "Conclusory allegations, speculation, and unsubstantiated asserts are not evidence, and, are not enough to defeat a well-supported motion for summary judgment." *Pearce v. Faurecia Exhaust Sys., Inc.*, 529 Fed. App'x 454, 458 (6th Cir. 2013). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587.

## B.     MERITS.

Inmate Fugate, having been convicted and incarcerated "does not have the same liberty interest as a free man." *District Attorney's Office For Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009).  In fact, "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged," he is rightfully and "constitutionally deprived of his liberty." *Id*. at 69. "[W]hile persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer*, 468 U.S. 517, 524 (1984).  Thus, prisoners should be afforded "those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Id*. at 523.    Moreover, "[r]andom searches of inmates, individually or collectively, and their cells and lockers are valid and necessary to ensure the security of the institution and the safety of inmates and all others within its boundaries." *Id*. at 529.  According to the Court, a "prisoner's expectation of privacy always yield to what must be considered the paramount interests in institutional security." *Id*. at 528.  In other words, the "loss of freedom of choice and privacy are inherent incidents of confinement." *Id*. at 527, citing, *Bell v. Wolfish*, 441 U.S. 520, 537 (1979).

A prison officials "first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson v. Austin*,

545 U.S. 209, 227 (2005). The potential for prison riots, inmate violence, and escape attempts are realities that correctional facilities face on a daily basis. *Hanrahan v. Mohr*, 905 F.3d 947, 954 (6th Cir. 2018) ("given the 'complex and intractable' problems of prison administration, we recognize that federal courts are 'ill-equipped to deal with the increasingly urgent problems of prison administration[.]"). This is particularly true at maximum security institutions, like SOCF. (R. 61-4, Erdos dec., ¶2; PageID# 596.) It is well recognized that prisons, by their very nature, "are dangerous places." *Johnson v. California*, 543 U.S. 499, 515 (2005). "Prisons are necessarily dangerous places; they house society's most dangerous people in close proximity with one another." *Farmer v. Brennan*, 511 U.S. 825, 858 (1994) (J. Thomas concurring). "Inmates get [to prison] by violent acts, and many prisoners have a propensity to commit more." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). "[I]t is 'difficult to imagine an activity in which a State has a stronger interest…than the administration of its prisons. '" *Woodford v. Ngo*, 584 U.S. 81, 94 (2006).

"The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States." *Meachum v. Fano*, 427 U.S. 215, 229 (1976). "Because a prison administrator's decisions and actions in the prison context are entitled to great deference from the courts, the burden of proving reasonableness is a light burden." *Elliott v. Lynn*, 38 F.3d 188, 191 (5th Cir. 1994).

Moreover, "a prisoner's constitutional rights must be exercised with due regard for the 'inordinately difficult undertaking' of modern prison administration." *Fortner v. Thomas*, 983 F.3d 1024, 1029 (11th Cir. 1993). "[G]iven the 'complex and intractable' problems of prison administration, we recognize that federal courts are 'ill-equipped to deal with the increasingly urgent problems of prison administration[.]" *Hanrahan*, 905 F.3d at 954. "Maintaining safety and order at these institutions require the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to problems they face." *Florence v. Bd. of Chosen Freeholders*, 556 U.S. 318, 326 (2012). "The difficulties of operating" a maximum-security prisoner—like SOCF—"must not be underestimated by the courts." *Id.* at 326.    Furthermore, prison policies "impinging on an inmate's rights must be upheld 'if it is reasonably related to a legitimate penological interest." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Failing to afford Warden Erdos this deference was the District Court's over-arching error.

## 1. The District Court erred in denying Warden Erdos summary judgment as to his Fourth Amendment claim.

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures, shall not be violated." Const. Amend. IV.   "The applicability of the Fourth Amendment turns on whether 'the person invoking its protection can claim a

17

'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Hudson*, 468 U.S. at 524. However, "imprisonment carries with it the circumscription or loss of many significant rights." *Id*. According to *Bell v. Wolfish*, "maintaining institutional security and preserving internal order are essential goals" that can lead to the "retraction of retained constitutional rights of [omit] convicted prisoners[.]"441 U.S. 520, 546 (1979). In other words, "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 547. Although the Supreme Court held that although a strip-search of pre-trial detainees was invasive, the State had a compelling interest in preventing the hiding and smuggling of weapons, drugs, and other contraband. *Id*. at 523. The Court recognized "given the realities of institutional confinement" any alleged "privacy" expected by a prisoner "necessarily would be of a diminished scope," and further cautioned courts must not "become increasingly enmeshed in the minutiae of prison operations[.]" *Id*. at 559, 562.

Subsequently in *Florence v. Bd. of Chosen Freeholders*, the Supreme Court rejected the notion that strip-searches are only permissible when "conducted only pursuant to an enunciated general policy or when suspicion is directed at a

particular inmate[.]" 566 U.S. 318, 328 (2012). The Court further held that "deference must be given to the officials in charge of the [prison] unless there is '*substantial evidence*' demonstrating their response to the situation was exaggerated." 556 U.S. at 330.

The Fourth Amendment "protects (in a severely limited way) an inmate's right to bodily privacy during visual inspections, subject to reasonable intrusions that the realities of incarceration often demand." *Henry v. Hulett*, 969 F.3d 769, 779 (7th Cir. 2020) (*en banc*). The constitutionality of strip searches in prisons "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013). The test was outlined by the Sixth Circuit:

> The constitutionality of the *searches* at issue in this case involves a three-step analysis. First, we determine the nature of intrusion, "examin[ing] the scope, manner, and location of the *search*." *Stoudemire, 705 F.3d at 572*. Second, we "evaluate the need for the *search*, giving due deference to the correctional officer's exercise of her discretionary functions." *Id.* And third, "we determine whether the *search* was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

*Sumpter v. Wayne Cty.*, 868 F.3d 473, 483 (6th Cir. 2017). "An intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate's interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system." *Sumpter.*, 868 F.3d at 483. The passing of weapons, and other contraband, can escape "unnoticed by even the most

19

vigilant observers." *Block v. Rutherford*, 468 U.S. 576, 588-89 (1984). To that end, strip searches serve a legitimate interest because they "are designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches." *Florence*, 566 U.S. at 334. The Fourth Amendment only protects prisoners from strip searches that go beyond these legitimate penological interests. *Id*. at 330.

An inmate's privacy interests "must yield" to safety considerations in a correction's setting. *Sumpter*, 868 F.3d at 483. Pertaining to scope of a search, if the strip search occurs in a location where others can observe, it is considered more invasive. *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 573 (6th Cir. 2013). When evaluating the need for a strip search, courts suggest that exigent circumstances can justify a strip search. *Id*. at 573-74; See also, *Elliott*, 38 F.3d at 191. (Strip searches, conducted after an increasing number of stabbings and murders occurred, were upheld as a reasonable way to manage the emergency crisis.) Prisons have a legitimate penological interest in removing weapons, and other contraband, because they disrupt and are a danger in the prison setting. *Florence*, 566 U.S. at 332.

### a. The scope, manner, and location of Fugate's search favors Warden Erdos.

Under a post-order, Fugate's cell was searched every day on first and second shift, given that he was placed in J1 for attacking an officer who was in the process

of reviewing his recent attack on another inmate. (R. 61-14 & R. 61-15, RIB records; PageID# 620, 627; R. 61-4, Erdos, ¶3 & 5; PageID# 596.) Thus, Fugate was placed in J1 "where inmates are housed who have committed the most violent offense[s][.]" (R. 61-4, Erdos dec., ¶7; PageID# 597.) Pursuant to post-orders at the time, inmates celled in the slammer cells, and double cells had their cells searched, and they were strip-searched in the shower every day on first and second shifts. (R. 61-4, Erdos, ¶7; PageID# 597.) These searches were conducted in manner where prisoner/guard interaction were minimized: the guards cuff the inmates at the cuff-port and then leaves the cell block. The cell door is electronically opened, and the inmate walks of his own accord to the shower room to be secured and searched. (R. 61-4, Erdos, ¶ 8; PageID# 597.) After the inmate is searched, his cell is searched for contraband. (*Id*.) After both the search of the cell and inmate are completed, the inmate is allowed to walk back to his cell handcuffed, and once he enters his cell, the guard removes the cuffs by way of the cuff-port. (*Id*.)  There is no evidence that the strip-searches were conducted in a manner meant to embarrass or demean the Plaintiff, or performed in front of other inmates or female guards. Rather, they are conducted in the shower room.

Given that the searches were conducted in the showers, outside the presence of other inmates and female guards, the District Court erred by giving too much weight to the speculative idea that Fugate was strip-searched in view of several

male guards. (R. 89, Dist. Ct. Order; PageID# 1335-36.)  There is no evidence that the strip-searches were conducted in a manner meant to embarrass or demean the Plaintiff, or performed in front of other inmates or female guards.  Rather, the *visual* searches were conducted in the shower room before a guard and a supervisor. (Doc. R. 66-2, Whitman Dec., ¶6, PageID# 1049.)     Fugate acknowledged that he was not searched before other inmates. (R. 78-1, Fugate depo; PageID# 1133-1211.)   In fact, the manner in which the searches were conducted, refutes such conjecture. These searches were conducted in manner where prisoner/guard interaction were minimized: when Fugate's cell was searched, he was taken to the shower and placed inside.  Once inside, the inmate removed his clothes and then visually searched for weapons.  After the cell was searched, the inmate walked back to his cell fully clothed. (R. 66-2, Whitman dec., ¶¶6-7; PageID# 1049.)  Fugate was never observed by other inmates, and was only observed by male guards assigned the task. (Doc. R. 66-2, Whitman Dec., ¶8; PageID# 1049.)

Fugate never alleges he was viewed by other inmates or female guards. More to the point, "strip searches are especially humiliating when they are conducted in front of other inmates." *Sumpter*, 868 F.3d at 483.  In other words, the constitutional threshold is only triggered when "the stripped individual is exposed to *bystanders* who do not share the searching officers institutional need to

view [him] unclothed." *Williams v. City of Cleveland*, 907 F.3d 924, 936 (6th Cir. 2018) (emphasis added).  However, no caselaw suggests strip-searches must be man-to-man.  Also, no caselaw suggests how many guards are required before a legally permissible strip-search is rendered constitutionally problematic.  There is simply no evidence that suggests that Fugate was strip-searched in view of other inmates, female guards, or an unnecessary number of male guards.  The District Court erred by pointing to a lack of evidence as a triable inference that Fugate was searched in view of one male guard to many.  (R. 89, Dist. Ct. Order; PageID# 1335.)

The District Court also erred by relying on Fugate's allegations regarding the manner in how the searches were conducted by non-parties, and attributing that conduct to Warden Erdos. (R. 89, Dist. Ct. Order, PageID# 1336.)  The District Court acknowledged that Warden Erdos is not liable by *respondent superior*, but held Erdos could still be liable for the "totality of the circumstances surrounding the scope, manner, and location of a search." (R. 89, Dist. Ct. Order; PageID# 1337.)  The District Court further speculated that although there was "no direct evidence" linking Warden Erdos to the "'manner' of the searches," Erdos could still be liable based on "inferential evidence" of animus. (R. 89, PageID# 1337.) In its R&R, the Magistrate Judge strongly suggested that Warden Erdos was liable for conduct of Defendant Eshem and other guards for the manner in how the searches

were conducted. (R. 80, R&R; PageID# 1253-54.)    Warden Erdos is the only defendant named as this unlawful search claim, and there is no evidence demonstrating that Erdos actively participated in the searches, or ordered that those searches be conducted in an unprofessional manner.    In other words, there is no record of evidence that Warden Erdos was present, and stood silent, during any of these alleged incidents that Fugate describes. "A plaintiff must be able to identify with particularity the [omit] officer who engaged in the alleged misconduct because a [omit] officer 'is only liable for his or her own misconduct.'" *Burley v. Gagacki*, 729 F.3d 610, 621 (6th Cir. 2013).    Furthermore, Erdos can only held liable if Fugate's "injury was caused by [Erdos'] tortious conduct, not by something or someone else." *Pineda v. Hamilton Cty*., 977 F.3d 483, 490 (6th Cir. 2020).

Furthermore, the District Court relied almost exclusively on Whitman's email passing along Warden Erdos' order that the searches take place. (R. 89, PageID# 1336-37; R. 54-1, Whitman email; PageID# 281.)    The email never mentions *how* the strip-searches were to be conducted. This email only proves that Erdos ordered that the searches be conducted, not the manner by which they were allegedly performed. *Pineda*, 977 F.3d at 490 (Sixth Circuit has long "refused to use '*respondeat superior'* theories to find a party liable based on the actions of subordinates.")    Because there is no evidence linking Defendant Erdos' email

24

directive to the alleged manner in which the strip-searches were conducted, the District Court erred in relying on the alleged actions of Warden Erdos' subordinates in its analysis.

### b. The District Court failed to give deference to Warden Erdos' judgment.

Given Fugate's recent violent conduct, the need for the cell searches (and accompanying strip searches) was obvious. As stated previously, Fugate admittedly planned and attacked a hearing officer with a weapon, just a short time after attacking an inmate (R. 78-1, Fugate depo.; PageID# 1138, 1189-90.) A homemade weapon—flattened battery casing with a sharpened edge—was found at the scene where the incident occurred. (R. 61-12, Cooper dec., ¶4; PageID# 615.) Plaintiff told the nurse in the infirmary that his motive was his desire for a transfer to OSP. (Ex. D, U of F Rpt., Medical Exam Rpt., p. 53.) Thus, Fugate was placed in a slammer cell where, per post-orders, his cell (and body) was searched on first and second shift. (R. 66-2, Whitman dec., ¶7; PageID# 1049.) According to Captain Whitman, the slammer cells "are reserved for inmates deemed particularly dangerous to staff and other inmates." (Doc. R. 66-2, Whiteman Dec., ¶ 5, PageID# 1048.) In a matter of weeks, Plaintiff had attacked an inmate and a staff member, thus qualifying for being deemed "particularly dangerous." (Doc. R. 61-4, Erdos Dec., ¶7, PageID# 597.) Concerned for the safety of staff and other inmates, Warden Erdos reasonably chose to have Plaintiff's cell and body searched

on third shift out of fear he might get passed a weapon by inmate porters at the end of second shift. (R. 61-4, Erdos, ¶10; PageID# 597.) Warden Erdos reasonably believed that Plaintiff might attack another inmate or staff until he got the transfer he desperately sought. (R. 61-4, Erdos, ¶ 9-10; PageID# 597.) The strip searches only lasted thirty days until Warden Erdos was assured Fugate did not have, or could not obtain, another weapon. (*Id*.)  Given that Fugate had recently attacked another inmate, and then a member of staff, Warden Erdos had every reason to believe that Fugate was particularly dangerous. *Stoudmire*, 705 F.3d at 574 ("[A] history of maladaptive behavior within prison… weigh[s] in favor of conducting of the search.")

As to the District Court's failure to afford sufficient deference to Warden Erdos' search orders, the District Court found there was substantial evidence[1] to justify "removing" deference from Warden's Erdos' "judgment." (R. 89, PageID# 1338.)  As to Warden Erdos' reasonable concerns for the safety of the prison, the District Court disregarded that deferential concern, and merely noted that a jury should decide "the validity of the professed penological objective." (*Id*.)  The District Court erred in refusing to afford deference to the post-order that required twice-daily searches for occupants of slammer cells located in J-1, and Warden

---

[1] In its R&R, the Magistrate Judge only found "some evidence" to sidestep the deference owed correction officials. (R. 80, R&R, PageID# 1254).  After objections, the District Court deemed the evidence "substantial." (R. 89, Dist. Ct. Order; PageID# 1338.)

Erdos' decision to have Plaintiff Fugate searched one additional time on third shift. Warden Erdos had ample justification for ordering the searches based on Fugate's recent displays of violence alone. The District Court's findings fail to adhere to the Supreme Court's admonition that "prison officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence*, 566 U.S. at 328. According to the Court, prison policies, whether verbal or written, must be afforded deference. *Bell*, 441 U.S. at 547 ("[P]rison officials must be afforded deference… in the adoption and execution of policies and practices… needed to preserve internal order and to maintain institutional security.") "An intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate's interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system." *Sumpter*., 868 F.3d at 483. To that end, strip searches serve a legitimate interest because they "are designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches." *Florence*, 566 U.S. at 334. The Fourth Amendment only protects prisoners from strip searches that go beyond these legitimate penological interests. *Id*. at 330.

Fugate was searched under post-orders, during first and second shifts, because his cell was searched at that time. Because Fugate was removed from his cell, to allow his cell to be searched, he was required to be strip-searched. As to

Warden Erdos' order that Fugate be search on third shift, Fugate had just recently smuggled a weapon into the hearing, and attacked a hearing officer.  Warden Erdos had a legitimate concern that a weapon could be smuggled to him by porters during the end of second shift. (R. 61-4, Erdos ¶10, 11; PageID# 597.)  In fact, Erdos recollected where contraband had been smuggled to a slammer cell previously. (R. 73-1, Erdos ¶2; PageID# 1108.) The Supreme Court upheld strip-searches in *Bell* even though "[t]here had been but one instance in which an inmate attempted to sneak contraband back in the facility." *Id*, citing, *Bell*, 441 U.S. at 559 (J. Marshall dissenting).

### c. Fugate's searches were reasonably related to a legitimate penological interests by weighing the need against the invasion.

The searches ordered by Defendant Erdos were reasonably related to a legitimate penological interest, which outweigh Plaintiff's expectation of privacy (which is minimal for inmates at the best of times in a correctional setting). "[P]rivacy is incompatable with imprisonment" because prison staff "must be watchful in the cells, in the yards, in the cafeterias, in the showers, and even in the toilets, for violence may be planned or perpetrated in any of those locations." *Hulett*, 969 F.3d at 788 (J. Easterbrook dissenting).  Due to his recent behavior, and the fact that he was housed in a maximum-security prison, Fugate had a minimal expectation of privacy at SOCF.  Moreover, in a matter of weeks, Fugate

had attacked an inmate and a staff member. He was placed in a particular cell, in J1, which are reserved for "inmates deemed particularly dangerous." (R. 61-4, Erdos dec., ¶7; PageID# 597.)   Even now, Fugate admits that he planned and attacked Anderson, and had an unauthorized weapon when he did so. (R. 78-1, Fugate depo; PageID# 1138, 1195.)   Based on information he was provided, Warden Erdos had reasonable concerns that Fugate would attack somebody else until he got the transfer he sought. (R. 61-4, Erdos dec., ¶ 9 & 10; PageID# 597.) Given that the searches were conducted in the showers, outside the presence of other inmates and female guards, the need for the searches to maintain safety outweighed Fugate's individual privacy concerns. *Cornwell v. Dalberg*, 963 F.3d 912, 916 (1992) ("[F]orced exposure to strangers of the opposite sex… raised a valid privacy claim under the Fourth Amendment.")   In the present case, there is no evidence that Fugate was searched in the presence of female guards or other inmates.

Inmates who have a recent history of crafting weapons, in violation of numerous rules, are more likely to seek and use dangerous contraband. *Stoudmire*, 705 F.3d at 574; *United States v. Hathorn*, 920 F.3d 982, 986 (5th Cir. 2019). According to Captain Whitman, "for the safety of all, when an inmate's cell is searched, the inmate must first be taken to the shower and strip-searched for weapons." (Doc. R. 66-2, Whitman Dec., ¶ 5-6, PageID# 1048-1049.)   There is no

dispute that the Fourth Amendment has no application to "the confines of a prison cell." *Hudson*, 468 U.S. at 526. Thus, searching Fugate's cell thrice daily was perfectly legal. That being said, Fugate was too dangerous to simply allow him stand outside his cell, or stay in his cell, when his cell was searched. *Id*. Furthermore, anytime Fugate was outside his cell, he had to be strip-searched. *Id*. Given that Fugate had recently attacked an inmate and a member of staff, Warden Erdos reasonably believed Fugate to be particularly dangerous. (Doc. R. 61-4, Erdos Dec., ¶9 & 10, PageID# 597.) For inmates, like Fugate, who have proven themselves to be dangerous, this procedure protects both inmates and guards alike. *See*, *Hollis v. Erdos*, 480 F.Supp.3d 823, 825 (S.D. Ohio 2020) (Warden and guards sued by four inmates for failing to strip-search another inmate before allowing him out of his cell, where he then proceeded to stab plaintiffs.) Furthermore, the District Judge failed to recognize that strip-searches are legally permissible to "deter the smuggling of weapons, drugs, and other prohibited items." *Florence*, *supra*. at 327; *Stoudmire*, *supra*. at 574 ("deterring the possession of contraband is a legitimate penological objective.") Fugate was less likely to fashion another weapon, or attempt to obtain another weapon, if he was routinely being subject to strip-searches. As the Sixth Circuit has recognized, "an intrusive search is not necessarily an unreasonable one" and "an inmate's interest

in being free must yield to the realities of operating a safe and effective corrections system." *Williams*, 907 F.3d at 936, citing, *Sumpter*, 868 F.3d at 483.

Contrary to the District Court's findings, the searches ordered by Defendant Erdos were reasonably related to a legitimate penological interest, which outweighed Fugate's expectation of privacy, especially in a maximum-security prison like the Southern Ohio Correctional Facility. In a matter of weeks, Fugate had attacked an inmate and a staff member. He was placed in a particular cell, in J1, which are reserved for "inmates deemed particularly dangerous." (R. 62-4, Erdos, ¶7, PageID# 774.)  Warden Erdos had particularized concerns that Fugate would attack somebody else until he got the transfer he sought. (R. 62-4, Erdos, ¶ 9 & 10; PageID# 774.)  Given that the searches were conducted in the showers, outside the presence of other inmates and female guards, the need for the searches to maintain safety outweighed Fugate's individual privacy concerns.

## 2. The District Court erred in denying Defendant Erdos summary judgment as to Fugate's Eighth Amendment claims.

The original understanding of the Eighth Amendment was to proscribe punishments that equated to "torture" and "unnecessary cruelty[.]" *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878).   However, the Supreme Court recognized that the Eighth Amendment "could be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson v.*

*Seiter*, 501 U.S. 294, 297 (1991). As to Plaintiff's Eighth Amendment claim, where conditions of confinement are not actually "meted out punishment by [a] statute or sentencing judge," prison officials can only impose "punishment" if they "act with a sufficiently culpable state of mind." *Seiter*, 501 U.S. at 300.  Hence, "infliction of punishment is a deliberate act intended to chastise or deter." *Id*.  In other words, an inmate must show that the state official acted with "'obduracy and wantonness' rather than 'inadvertence or error in good faith[.]'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018), citing, *Seiter*, 501 U.S. at 299. "In contrast to the reasonableness standard of the Fourth Amendment, the Eighth Amendment standard focuses on the official's 'obduracy and wantonness,' [cite omitted] asking 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002), citing, *Whitley v. Albers*, 475 U.S. 312, 319 (1986). In the context of strip-searches, Fugate is not entitled to relief unless the strip-searches were "undertaken [both] maliciously and sadistically." *Cornwell v. Dahlberg*, 963 F.2d 912, 918 (6th Cir. 1992) (Ct applied *Whitley* standard in strip-search case.)

Because Fugate fails to "point to any evidence of maliciousness," he fails to offer any evidence to support his contentions that Erdos acted with requisite intent. *Parkell v. Danberg*, 833 F.3d 313, 336 (3rd Cir. 2016) ("As Parkell does not point

to any evidence of maliciousness, the search policy cannot serve as a basis for imposing Eighth Amendment liability[.]"); *King v. McCarthy*, 781 F.3d 252, 258 (7th Cir. 2015) (*en banc*) (prisoner must show "that the strip-search in question was motivated by a desire to harass and humiliate.") Again, Plaintiff attacked a staff member, and an inmate, within a short period of time. (R. 61-14, 61-15, RIB docs, PageID# 620, 627.)  A homemade weapon was found at the scene of the second attack. (R. 61-4, Erdos, ¶9; PageID# 597; R. 61-12, Cooper, ¶4; PageID# 615.) Fugate used a weapon "cut" the other inmate "around the face and neck." (61-14, RIB docs; PageID# 620, 625.)  Plaintiff was taken to J1, and housed in a cell where searches were routinely conducted during first and second shift. (R. 61-4, Erdos, ¶7, PageID# 597.) When an inmate leaves his cell at J1, in order to allow guards to search his cell, he is strip-searched in the shower. (R. 61-4, Erdos, ¶8; PageID# 597, R. 66-2, Whitman, ¶7; PageID# 1049.) Because Warden Erdos had justifiable concerns that Plaintiff might attack somebody else, he made the reasonable decision have Fugate searched on third shift. (R. 61-4, Erdos, ¶10, PageID# 597.)

The District Court cited Warden Erdos' email order and alleged act of personally informing Fugate that he was not being transferred to OSP as evidence of "malice." (R. 89; PageID# 1339.)  According to the District Court, a reasonable jury could find that Warden Erdos "was angry with [Fugate] and chose to keep him

in J1 to punish him for assaulting an officer." *Id*. at 1340.  This is all speculation given that Warden Erdos had ample justification for the searches; Fugate's recent proclivity for violence. The evidence relied upon by the District Court only proves that Warden Erdos was genuinely concerned about Fugate willingness to engage in acts of violence to advance his agenda.

Contrary to the District Court's decision, Fugate simply cannot show Warden Erdos acted maliciously and sadistically when he had Fugate strip searched every shift for thirty days.  Neither Fugate, nor the District Court, can "point to any evidence of maliciousness," and thus Fugate fails to offer any evidence to support his contentions that Erdos acted with requisite intent. *Danberg*, 833 F.3d at 336 (Plaintiff's Eighth Amendment claim failed where inmate searched three times a day, guards visually inspecting his private regions). Again, Plaintiff attacked a staff member, and an inmate, within a short period of time. (R. 78-1, RIB docs; PageID# 1138, 1189-90.)  SOCF had a rash of assaults where weapons were used. (R. 61-4, Erdos, ¶4; PageID# 596.)  A weapon was found at the scene where Plaintiff attacked Anderson. (R. 61-4, Erdos, ¶9; PageID# 597; R. 61-12, Cooper, ¶4; PageID# 615.)  Plaintiff was taken to J1, and housed in a cell where searches were routinely conducted during first and second shift. (R. 61-4, Erdos, ¶7; PageID# 597.) When an inmate leaves his cell at J1, in order to allow guards to search his cell, he is strip-searched in the shower. (R. 61-4, Erdos, ¶8; PageID#

597; R. 66-2, Whitman, ¶7; PageID# 1049) Because Warden Erdos had reasonable concerns (brought to his attention) that Plaintiff might attack somebody else in an effort to obtain a transfer to OSP, he made the decision have Fugate searched on third shift. (R. 61-4, Erdos, ¶10; PageID# 597)   Plaintiff has no evidence that Erdos' decision to have him strip-searched on third shift was malicious or sadistic. In fact, Erdos had concerns that a porter might smuggle him a weapon after the searches during second shift were completed. (R. 61-4, Erdos, ¶10; PageID# 597.) Fugate had proven himself to be a particularly violent inmate, and thus Warden Erdos ordered that extra precautions be taken to prevent him from hurting anyone else. *Stoudmire*, 705 F.3d at 574 (a prisoner's "history of maladaptive behavior within prison… weigh[s] in favor of conducting of the search.")

Fugate can only prove is that he was searched three times and day, and his personal conjecture that these searches were unnecessary.  Warden Erdos alleged conversation with Fugate, advising him that he was not being transferred to OSP (regardless of the alleged language used), does not establish a malicious and sadistic state of mind (R. 78-1; Fugate depo; PageID# 1190-91.) Even assuming the conversation took place, nothing from Fugate's version of that alleged conversation, other than Fugate's conjecture, even suggests that Warden Erdos was completely unconcerned about Fugate's ability to obtain a weapon yet ordered the strip-searches anyway.  Even assuming Erdos' alleged threats towards Fugate are

true, they only show that Erdos had real concerns that Fugate may hurt someone else, not that his response was somehow exaggerated. Based on Fugate's recent conduct, and comments made to others about wanting a transfer to OSP, Warden Erdos had legitimate concerns that Plaintiff was a likely threat to both staff and other inmates. (R. 61-4, Erdos, ¶9 & 10; PageID# 597.) Plaintiff freely admitted that not only did he attack an ODRC staff member, but that he planned to do so. (R. 78-1, Fugate depo., p. 7; PageID# 1138.)

All Plaintiff can prove is that Warden Erdos ordered that he be searched three times a day by an email, and Fugate's own personal theories that these searches were unnecessary. Contrary to the Magistrate Judge's suggestions otherwise, there is a total lack of evidence supporting his contentions of Warden Erdos' alleged maliciousness and sadistic motive. *EEOC v. Ford Motor Corp.*, 782 F.3d 753, 770 (6th Cir. 2015) (*en banc*) (non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'") In fact, given Plaintiff's recent conduct, and statements he made to other staff, Warden Erdos had ample justification to have him, and his cell, searched three times a day for thirty days. Contrary to the District Court's findings, the evidence only demonstrates a "good faith effort to restore and maintain discipline," and there is no evidence sufficient to suggest malicious or sadistic conduct, much less both.

### a. Warden Erdos is entitled to Qualified Immunity.

Warden Erdos is also entitled to qualified immunity, which precludes recovery in this case. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory and constitutional rights which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). Plaintiff Fugate shoulders the burden of showing that Warden Erdos is not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

A right is clearly established when "every reasonable official would [have understood] that what he is doing violates that right." *Reichie v. Howards*, 132 S.Ct. 2088, 2093 (2012). Thus, for a right to be "clearly established… [the] existing precedent must have placed the statutory or constitutional right question beyond debate." *Ashcroft v. al-Kid*, 563 U.S. 731, 741 (2011). In other words, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id*. at 743. To overcome a qualified immunity defense, "there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitely unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Mullenix*, 136 S.Ct. at

37

308.  "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S.Ct. 548, 552 (2017). The relevant inquiry must take into account the "specific context of the case, [and] not as a broad general proposition," and determine "whether the violative nature of the particular conduct is clearly established." *Mullenix*, 136 S.Ct. at 308.  Most of the cases regarding strip-searches involve guards who strip-search inmates in full view of other inmates or the searches are conducted in close proximity to members of the opposite sex. See, *Williams v. City of Cleveland*, 771 F.3d 945 (6th Cir. 2014); *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560, 572 (6th Cir. 2013).

### i.    No clearly established law that put Warden Erdos on notice that he was violating the Fourth Amendment.

The District Court erred by distinguishing *Sumpter v. Wayne County*, and finding that *Stoudemire v. Mich Dep't of Corr.* placed Warden Erdos on notice that his conduct was unconstitutional. (R. 89, Dist. Ct. Order; PageID# 1340-41.)   Fact is, neither case would have put Warden Erdos on notice that ordering that Fugate be searched three times a day would violate his Fourth Amendment rights.   In *Stoudmire*, the entire crux of the case was that the inmate was purposefully strip-searched, and her prosthetic leg removed, where other inmates could fully view her.  *Stoudmire*, 705 F.3d at 566.  In fact, the plaintiff could hear other inmates in

and the hallway and knew they could see her. *Id* at 567. According to *Stoudmire*, "the location of the strip search made it more invasive," because "others could see her naked." *Id*. at 573-574. Furthermore, in *Stoudmire*, the search appeared random without any discernable cause. *Id*. at 566. In the present case, Fugate had just recently engaged in an episode of violent behavior. (Doc. 78-1, Fugate depo., PageID# 1189-1190.) In fact, when defining the clearly established law in *Stoudmire*, the panel explained "the right not be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is related to a legitimate penological interest." *Id*. at 575. In the present case, Fugate was searched in a shower, and was only observed by guards whose responsibility it was to conduct the search. See, *Dufrin v. Spreen*, 712 F.2d 1084, 1089 (6th Cir. 1983) (because the search was "carried out discreetly and in privacy" there was no constitutional violation.) According to *Stoudmire*, "a strip search is more invasive when it is performed where other people can see the person being stripped." *Id*. at 573. In the present case, there is no evidence that the strip-searches were conducted in front of other inmates or female guards. Rather, the *visual* searches were conducted in the shower room by male guards assigned that task. (R. 66-2, Whitman Dec., ¶6, PageID# 1049.) Fugate admits that no other inmates saw him searched in the shower. (R. 78-1, Fugate depo.; PageID# 1189-1190.) In his deposition, at the initial search, Fugate stated "one officer" stripped searched him,

while a "white shirt" was present. (R. 78-1, Fugate depo; PageID# 1192.)  *Sumpter* and *Williams* involved the strip-searching of many inmates, in full view of each other, due to time constraints.   Like *Stoudmire*, the defendants in *Sumpter* and *Williams* were found to be entitled to qualified immunity even though the searches were conducted in front of other inmates. *Sumpter*, 868 F.3d at 572; *Williams*, 907 F.3d 935-36.    In this case, there is no such concern.

In the Fourth Amendment context, qualified immunity is particularly important given "the governing ad-hoc interest-balancing test," which is "sometimes difficult for an officer to determine how the relevant doctrine… will apply to the factual situation the officer confronts." *Sumpter*, 868 F.3d at 385.    In other words, "case-by-case incremental decision making of balancing tests" rarely "provide the fair notice… that qualified immunity precedent requires." *Id*.    Thus, "it is imperative" that the Plaintiff put forth a "a decision that 'squarely governs' the outcome of the case." *Id*.    In *Sumpter*, the Sixth Circuit rejected the legal proposition that "strip searches must be supported by a legitimate justification" was sufficient to place defendants on notice of clearly established law, as it was far to general.  *Id.*at 487.    According to the panel, "when the constitutional test is one of interest-balancing, the point at which the constitutional shades into unconstitutional will necessarily be gray." *Id.* at 488.    Most of the cases regarding strip-searches involve guards who strip-search inmates in full view of other

inmates or the searches are conducted in close proximity to members of the opposite sex or other inmates. *See*, *Williams*, 771 F.3d at 945; *Stoudemire*, 705 F.3d at 572.

However, when it comes to qualified immunity, Fugate bears the burden of coming up with clearly established caselaw that would have put the Erdos on notice that his actions were unconstitutional. *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). Furthermore, the District Court erred by being too general in her assessment of the clearly established right allegedly provided by *Stoudmire*. *Kisela v. Hughes*, 138 S.Ct. 1148, 1152-53 (2018) ("[G]eneral rules" cannot provide officers with sufficiently clear warning "outside an 'obvious case.'"); *See also*, *Mullenix*, 136 S.Ct. at 309 (Qualified immunity protects officers "unless existing precedent 'squarely governs' the specific facts at issue.") In other words, existing precedent does not govern unless there is "controlling authority" or "a robus consensus of cases of persuasive authority" addressing the question. *al-Kidd*, 563 U.S. at 742. Also, because the Fourth Amendment brings with it a balancing test, qualified immunity is even harder to establish. *Sumpter*, *supra*. at 487.

*Stoudmire* would not have put Warden Erdos on notice that subjecting Fugate to three strip-searches a day would violate the Fourth Amendment. As stated previously, *Stoudmire* involved an inmate being randomly strip-searched by a guard in full view of other inmates. *Stoudmire*, *supra*. at 566. That did not

happen here.   Also, neither *Fugate*, nor the District Court, has provided a "robust… consensus" of non-binding precedent establishing specific notice required by law." *Ohio Civil Service Employees Assoc. v. Seiter*, 858 F.3d 455, 461 (6th Cir. 2019). Thus, in the absence of clearly established law, Warden Erdos contends that the District Court erred in denying him qualified immunity.

> ### ii.   No clearly established law that put Warden Erdos on notice that he was violating the Eighth Amendment.

Again, like before, the District Court erred by being far too general in assessing the clearly established right. (R. 89, Dist. Ct. Order; PageID# 1342.) In fact, the District Court never cited any clearly established caselaw when denying Warden Erdos' qualified immunity as to the Eighth Amendment claim, and adopted the Magistrate Judge's over-general findings. (*Id*.)   In its analysis, the Magistrate Judge cited *Wilkins* and *Hudson*, for the general proposition, "[a]t the time of the strip searches at issue, it was clearly established that force applied 'maliciously and sadistically to cause harm' violates the Eighth Amendment." (R.. 80, R&R, PageID# 1261.) *See*, *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010); *See also*, *Hudson v. McMillon*, 503 U.S. 1, 7 (1992).   Neither *Hudson* nor *Wilkins* would have put "every 'reasonable officicial'" on notice that the ordering of thrice daily searches, in the wake a violent attack by an inmate, is unlawful. *al-Kidd*, 563 U.S. at 741.   *Hudson* merely stood for the proposition that inmates have no expectation

of privacy in their cells. 503 U.S. at 7. Moreover, *Wilkins* was an excessive use-of-force case. 559 U.S. at 35. These cases do not advance Fugate's argument for denying Erdos qualified immunity. Thus, both the District Court and the Magistrate Judge, failed to point to clearly established law that would have put Warden Erdos on notice that his actions violated the Eighth Amendment.

Lastly, the Magistrate Judge *sua sponte* raised 42 U.S.C. 1997e(e), and the District Court adopted its analysis, even though it admitted "there is not a firmly established body of case law in the area." (Doc. 80, R&R, PageID# 1260-1262; R. 89, Dist. Ct. Order; PageID# 142-43.) In denying qualified immunity, the District Court erred.

"[T]he basic purpose of 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." *Farrar v. Hobby*, 506 U.S. 103, 112 (1992). Thus, "no compensatory damages may be awarded in a 1983 suit absent proof of actual injury." *Id.*, (citing *Memphis Cmty Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986)). Under the Prison Litigation Reform Act ("PLRA"), specifically, "[n]*o Federal civil action may be brought* by a prisoner confined in a jail, prison, or other correctional facility, *for mental or emotional injury suffered* while in custody without a prior showing of physical injury[.]" 28 U.S.C. § 1997e(e) (emphasis added.) In other words, "all federal civil actions in which a prisoner alleges a constitutional violation . . . compensatory

43

damages for mental or emotional injuries non-recoverable, absent physical injury[.]" *Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005). Moreover, § 1997e(e) "requires a prior showing of physical injury that need not be significant but must be more than *de minimis*." *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002); *Liner v. Goord*, 196 F.3d 132, 135 (2nd Cir. 1999). "Where, as here, the statute's language is plain, 'the sole function of the court is the enforce according to its terms.'" *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 241 (1989).

In fact, there is clearly established law that § 1997e(e) applies to other Eighth Amendment contexts. In *Harden-Bey v. Rutter*, the Sixth Circuit held that an inmate could not sue for the alleged discomfort he allegedly suffered as a result of segregation, by way of an Eighth Amendment challenge, "without a prior showing of actual injury." 542 F.3d 789, 795 (6th Cir. 2008). "Under the PLRA, a prisoner must suffer a physical injury to recover monetary damages; there can be no recovery for purely emotional and mental distress… [t]his provision of the PLRA applies to all civil actions—even those alleging First Amendment or other constitutional provisions." *Yaacov v. Collins*, 2010 U.S. App. LEXIS 27719, *9 (6th Cir. 2010) (citing *Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2010).

The Sixth Circuit's decision in *King v. Zamiara* does not change the result. *Id*., 788 F.3d 207, 212-213 (6th Cir. 2015). In *Zamiara*, the Sixth Circuit

44

acknowledged that § 1997e(e) barred mental and emotional injuries without prior proof of physical injury. *Id*. at 212.  However, the Court held that 1997e(e) "says nothing about claims brought to redress constitutional injuries, which are distinct from mental and emotional injuries." *Id*. at 213.  Thus, even under *Zamiara*, absent physical injury, compensatory damages for mental and emotional injuries are off limits.  *Id*.  The District Court relied heavily on *Zameria*, and never mentioned *Rutter*. (R. 89, PageID# 1343.)  It is worth noting, unlike *Rutter* that dealt with the Eighth Amendment, *Zamiara* involves a First Amendment retaliation claim. *Id*. Moreover, *Zamiara* does not reach as far as the District Court assumed, and the *Rutter* is more on point.

Ordinarily, the type of damages available to plaintiffs who sue under 1983 are "determined according to principals derived from common law torts." *Uzegbunam v. Prezewski*, 141 S.Ct. 792, 798 (2021), citing, *Stachura*, 477 U.S. at 306.  However, with the passage of the Prison Litigation Reform Act, Congress chose to limit the gambit of damages, previously permissible at common law, which are allowed in most lawsuits brought under 18 U.S.C. § 1983. 42 U.S.C § 1997e(e)'s plain "language addresses an otherwise available remedy in civil actions." *Hoever v. Marks*, 993 F.3d 1353, 1358 (11th Cir. 2021) (*en banc*).

 "Prisoners bringing federal lawsuits… may not seek damages for mental or emotional injury unconnected with physical injury." *Minneci v. Pollard*, 556 U.S.

118, 129 (2012), citing, 42 U.S.C. § 1997e(e). According to Black's law dictionary, "Mental harm" is defined as "[a]ny impairment of the functioning of a person's mind, esp. when the impairment has resulted from something external, such as an injury." Gardner, Bryan; *Black's Law Dictionary*, 10th Ed., p. 1135 (1990). "Emotional harm" refers the reader to "emotional distress" *Id*. at 638. "Emotional distress" is a "highly unpleasant mental reaction (such as anguish, grief, fright, humiliation, or fury) that results from another person's conduct; emotional pain and suffering." *Id* 575.   Moreover, "Emotional distress, when severe enough, can form the basis for the recovery[.]" *Id*. Furthermore, it includes "all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Id*. at 576.   These definitions are broad, and cover most common law basis for damages. For example, in *Rutter*, the Sixth Circuit held that damages brought about by the "discomfort of segregation" was explicitly prohibited by § 1997e(e). 524 F.3d at 795.   The statute's plain text "bars" all forms of "compensatory damages stemming from purely mental or emotional harms" *Hoever*, 993 F.3d at 1358.   That eliminates most damages raised by Fugate for Warden Erdos' allegedly unlawful searches.

The Supreme Court has explicitly instructed that damages cannot be "measured by the jury perception of the abstract 'importance' of a constitutional

right." *Stachura*, 477 U.S. at 310. In fact, the Supreme Court instructed that "no compensatory damages could be awarded for [a] violation of [a constitutional] right absent proof of actual injury." *Id*. at 308. Hence, unlike nominal damages, "substantial damages should be awarded only to compensate actual injury[.]" *Carey v. Piphus*, 435 U.S. 247, 265 (1978). Under § 1997e(e), Plaintiff cannot make a viable claim for compensatory damages based on allegations of unlawful visual searches, without proof of actual injury.

Furthermore, the extent of § 1997e(e) has been recognized in courts throughout the country. *See*, *Geiger v. Jowers*, 404 F.3d 371, 374-375 (5th Cir. 2005); *Royal v. Kautzky*, 375 F.3d 720, 723-724 (8th Cir. 2004); *Searles v. Van Bebber*, 251 F.3d 869, 875-876 (10th Cir. 2001); *Allah v. Al-Hafeez*, 226 F.3d 247, 250 (3rd Cir. 2000). Moreover*,* this Court must consider Supreme Court's most recent instructions regarding the PLRA. *See Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016). In *Ross*, referencing the PLRA's plain language, the Supreme Court warned "[t]ime and again, this Court has taken such statutes at face value— refusing to add unwritten limits onto their rigorous textual requirements." *Id*. at 1857. Under *Ross*, the fact that the PLRA never mentions exempting constitutional claims from the requirement of a physical injury showing is dispositive. If Congress wished to exempt constitutional claims from 1997e(e) express instruction that mental and emotional injuries could not be awarded, absent

proof of physical injury, that exemption would have been inserted in the statute's plain language. *Kautzky*, 375 F.3d at 723.  With no explicit written exception carved out for constitutional injuries inserted in § 1997e(e)'s plaint language, and in light of several Supreme Court cases that one cannot recover compensatory damages without actual physical injuries, Fugate's request for compensatory damages for his allegedly unlawful visual strip-searches, without a prior showing of physical injury, is barred.

## V.    CONCLUSION

For all the reasons set forth above, Defendant Erdos respectfully requests that this reverse the judgment of the District Court.

Respectfully submitted,

**DAVE YOST**
Ohio Attorney General

/s/ *Charles A. Schneider*
CHARLES A. SCHNEIDER (0005821)
THOMAS E. MADDEN (0077069)
Assistant Attorney General
Criminal Justice Section
Corrections Litigation Unit
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
T: (614) 644-7233; F: (866)523-8127
Charles.Schneider@ohioago.gov

*Counsel for Defendant-Appellant*

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO</u>
## <u>FEDERALRULE OF APPELLATE PROCEDURE 32(A)(7)</u>

Pursuant to Federal Appellate Rule 32(a)(7), I certify that this document contains 11,304 words, as determined by the word processing system used to prepare this brief.  Federal Appellate Rule 32(a)(7)(B) provides that principal briefs shall not exceed 14,500 words.

*/s/ Charles A. Schneider*
**CHARLES A. SCHNEIDER (0005821)**
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing *Brief of Defendant-Appellant* was filed via electronic transmission on January 18, 2022.  All participants in the case are registered CM/ECF users and will be served electronically via that system.

*/s/ Charles A. Schneider*
**CHARLES A. SCHNEIDER (0005821)**
Assistant Attorney General

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KARL FUGATE,                          :
                                      :
    Petitioner-Appellee,          :
                                      :    Case No. 21-4025
       v.                       :
                                      :
RONALD ERDOS, et al.,                 :
                                      :
    Defendant-Appellant.          :

---

## DEFENDANT-APPELLANT'S DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

---

| DESCRIPTION OF ITEM | RECORD ENTRY NUMBER | PAGE ID |
|---|---|---|
| Complaint | 3 | 40-59 |
| R & R | 4 | 60-68 |
| MSJ | 61 | 482-503 |
| Use of Force Report (5/2/17) | 61-3 | 509-595 |
| Ronald Erdos Declaration | 61-4 | 596-598 |
| Gary Fri Declaration | 61-6 | 603-604 |
| John McCoy Declaration | 61-7 | 605-606 |
| Brian Nolan Declaration | 61-8 | 607-608 |
| Randy Cooper Declaration | 51-12 | 615 |
| Inmate Fugate RIB docs | 61-14 | 620-626 |
| Inmate Fugate RBI docs (Anderson) | 61-15 | 627-636 |
| Motion for Leave | 64 | 1044-1045 |
| Notation Order | 10/13/2020 | Entry |

50

| Notice of Filing Exhibits | 66 | 1044-1045 |
| JD Whitman Declaration | 66-2 | 1048-1049 |
| Brian Nolan Amended Declaration | 66-3 | 1050-1051 |
| Reply | 73 | 1104-1107 |
| Ronald Erdos Declaration | 73-1 | 1108 |
| Magistrate Judge's Order | 77 | 1129 |
| Inmate Fugate Deposition | 78-1 | 1132-1227 |
| R & R | 80 | 1234-1264 |
| Defendant's Objections | 83 | 1271-1302 |
| Dist. Ct. Order | 89 | 1331-1345 |
| Notice of Appeal | 90 | 1346-1347 |