No. 21-4025

_____

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

KARL FUGATE,

Plaintiff-Appellee,

v.

RONALD ERDOS,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Southern District of Ohio
No. 1:19-cv-00030, District Judge Timothy S. Black

_____

**BRIEF FOR PLAINTIFF-APPELLEE KARL FUGATE**

_____

Oren Nimni
RIGHTS BEHIND BARS
416 Florida Ave. NW, #26152
Washington, DC 20001
oren@rightsbehindbars.org

Catherine E. Stetson
Matthew J. Higgins
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Phone: (202) 637-5889
Fax: (202) 637-5910
matthew.higgins@hoganlovells.com

March 10, 2022

*Counsel for Plaintiff-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Sixth Circuit Rule 26.1, Plaintiff-Appellee makes the following disclosure:

1.    Plaintiff-Appellee is not a subsidiary or affiliate of a publicly owned company.

2.    There is no publicly owned corporation, not a party to this appeal, that has a financial interest in the outcome of this appeal.

/s/ Matthew J. Higgins
Matthew J. Higgins
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Phone: (202) 637-5889
matthew.higgins@hoganlovells.com

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ......................................................................... v

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION........................................................... 3

STATEMENT OF THE ISSUES FOR REVIEW .................................................... 3

STATEMENT OF THE CASE................................................................... 4

     A.    Factual Background............................................................. 4

          1.  After Fugate assaults a prison guard, other guards beat Fugate so badly that he must be immediately hospitalized ............5

          2.  Erdos orders that Fugate be placed in solitary confinement and strip searched three times a day for thirty days........................8

     B.    Procedural Background ........................................................11

          1.  Fugate files suit in the Southern District of Ohio ..........................11

          2.  The District Court denies summary judgment to Felts and Eshem for the infirmary beating ....................................12

          3.  The District Court rules several material facts relevant to the strip-search claims against Erdos are genuinely disputed .............13

          4.  The District Court rules that under Fugate's version of events, Erdos violated Fugate's clearly established rights under the Fourth and Eighth Amendments ....................................16

               a.  Fugate's Fourth Amendment right not to be strip searched "by more officers" than those serving a penological purpose ............................................16

               b.  Fugate's Fourth Amendment right not to be strip searched without any penological justification ..................17

## TABLE OF CONTENTS—Continued

**Page**

     c.  Fugate's Eighth Amendment right not to be maliciously strip searched as a form of punishment............18

   5.  The District Court rejects Erdos's 1997e(e) argument .................18

   6.  Erdos files this interlocutory appeal...............................................19

SUMMARY OF THE ARGUMENT ........................................................19

STANDARD OF REVIEW ....................................................................21

ARGUMENT ........................................................................................22

I.     BECAUSE ERDOS IS UNWILLING TO CONCEDE FUGATE'S VERSION OF THE FACTS, THIS COURT LACKS JURISDICTION OVER THE ENTIRE APPEAL...................................22

II.    THIS COURT LACKS JURISDICTION TO CONSIDER ERDOS'S RECORD-BASED ARGUMENTS, WHICH ARE MERITLESS IN ANY EVENT ...............................................................26

III.   VIEWING THE RECORD IN THE LIGHT MOST FAVORABLE TO FUGATE, ERDOS VIOLATED FUGATE'S CLEARLY ESTABLISHED RIGHTS IN THREE SEPARATE WAYS .................37

    A. Fugate's Fourth Amendment Right Not To Be Strip Searched By More Officers Than Those Serving A Penological Purpose Was Clearly Established.......................................................38

    B. Fugate's Fourth Amendment Right To Be Free From Strip Searches Performed Without *Any* Penological Purpose Was Clearly Established.............................................................40

       1.  Case law clearly establishes an inmate's Fourth Amendment right to be free from strip searches performed without any penological interest ............................40

       2.  Erdos's qualified-immunity arguments fail ..............................44

# TABLE OF CONTENTS—Continued

**Page**

    C. Fugate's Eighth Amendment Right To Be Free From Strip Searches Maliciously Imposed As Punishment Was Clearly Established................................................................................49

        1. Case law clearly establishes Fugate's Eighth Amendment right to be free from strip searches maliciously ordered as punishment .................................................................49

        2. Erdos's sole qualified-immunity argument lacks merit............50

        3. This Court lacks jurisdiction to consider Erdos's Section 1997e(e) argument, which fails on the merits regardless .........52

CONCLUSION....................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>:

*Abu-Joudeh v. Schneider*,
  954 F.3d 842 (6th Cir. 2020) ...............................................................33

*Adams v. Blount County*,
  946 F.3d 940 (6th Cir. 2020) ......................................................*passim*

*Ajami v. Saab*,
  436 F. App'x 458 (6th Cir. 2011) .......................................................30

*Alspaugh v. McConnell*,
  643 F.3d 162 (6th Cir. 2011) ..............................................................34

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016)......................................................54, 55

*Austin v. Redford Twp. Police Dep't*,
  690 F.3d 490 (6th Cir. 2012) ..............................................................31

*Barker v. Goodrich*,
  649 F.3d 428 (6th Cir. 2011) ..............................................................46

*Barry v. O'Grady*,
  895 F.3d 440 (6th Cir. 2018) .......................................................28, 30

*Bell v. Wolfish*,
  441 U.S. 520 (1979)............................................................................47

*Bey v. Falk*,
  946 F.3d 304 (6th Cir. 2019) ..............................................................30

*Bono v. Saxbe*,
  620 F.2d 609 (7th Cir. 1980) ..............................................................43

*Bunkley v. City of Detroit*,
  902 F.3d 552 (6th Cir. 2018) .......................................................25, 27

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Campbell v. Mack*,
    777 F. App'x 122 (6th Cir. 2019) ....................................................31

*Carroll v. Carman*,
    574 U.S. 13 (2014) ..................................................................37, 48

*Coble v. City of White House*,
    634 F.3d 865 (6th Cir. 2011) .......................................................33, 34

*Cooke v. Nealy*,
    166 F.3d 341 (5th Cir. 1998) ............................................................50

*Cornwell v. Dahlberg*,
    963 F.2d 912 (6th Cir. 1992) ........................................21, 35, 49, 51

*Crawford v. Cuomo*,
    796 F.3d 252 (2d. Cir. 2015) .......................................................50, 51

*DeCrane v. Eckart*,
    12 F.4th 586 (6th Cir. 2021) .......................................................31, 53

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
    511 U.S. 863 (1994) ......................................................................54

*DiLuzio v. Village of Yorkville*,
    796 F.3d 604 (6th Cir. 2015) ...................................................*passim*

*District of Columbia v. Wesby*,
    138 S. Ct. 577 (2018) ................................................................37, 43

*Downward for Estate of Downward v. Martin*,
    968 F.3d 594 (6th Cir. 2020) ...........................................................27

*Estate of Barnwell by S.C.B. v. Grigsby*,
    681 F. App'x 435 (6th Cir. 2017) .....................................................31

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*,
    566 U.S. 318 (2012) .......................................................................35

vi

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Franklin v. Lockhart*,
   769 F.2d 509 (8th Cir. 1985) ...............................................43

*Gillispie v. Miami Township*,
   18 F.4th 909 (6th Cir. 2021) ........................................*passim*

*Guertin v. State*,
   912 F.3d 907 (6th Cir. 2019) ...............................................37

*Harden-Bey v. Rutter*,
   524 F.3d 789 (6th Cir. 2008) ...........................................53, 54

*Harris v. Ostrout*,
   65 F.3d 912 (11th Cir. 1995) ...............................................50

*Himmelreich v. Fed. Bureau of Prisons*,
   5 F.4th 653 (6th Cir. 2021) ........................................52, 53, 54

*Hodges v. Stanley*,
   712 F.2d 34 (2d Cir. 1983) ................................................43

*Hoever v. Marks*,
   993 F.3d 1353 (11th Cir. 2021) .............................................53

*Hudson v. McMillian*,
   503 U.S. 1 (1992) ......................................................18, 51

*Jackson v. City of Cleveland*,
   925 F.3d 793 (6th Cir. 2019) ...........................................48, 49

*Jacoby v. Mack*,
   755 F. App'x 888 (11th Cir. 2018) .........................................46

*Jefferson v. Lewis*,
   594 F.3d 454 (6th Cir. 2010) ...............................................22

*Johnson v. Jones*,
   515 U.S. 304 (1995) .......................................................21

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Jones v. Garcia*,
    345 F. App'x 987 (6th Cir. 2009) .......................................34

*Kennedy v. City of Villa Hills*,
    635 F.3d 210 (6th Cir. 2011) ..............................................36

*Kindl v. City of Berkley*,
    798 F.3d 391 (6th Cir. 2015) .......................................28, 30

*King v. Zamiara*,
    788 F.3d 207 (6th Cir. 2015) ...............................18, 54, 55

*Kisela v. Hughes*,
    138 S. Ct. 1148 (2018)........................................................37

*Kollin v. City of Cleveland*,
    557 F. App'x 396 (6th Cir. 2014) ....................................32

*Lippett v. Corizon Health, Inc.*,
    No. 20-1700, 2022 WL 304955 (6th Cir. Feb. 2, 2022)..............................27, 28

*Lucas v. Chalk*,
    785 F. App'x 288 (6th Cir. 2019) ...............................54, 55

*Mays v. Springborn*,
    575 F.3d 643 (7th Cir. 2009) ...........................................39

*McGrew v. Duncan*,
    937 F.3d 664 (6th Cir. 2019) ......................................27, 30

*Michenfelder v. Sumner*,
    860 F.2d 328 (9th Cir. 1988) ......................................43, 44

*Moldowan v. City of Warren*,
    578 F.3d 351 (6th Cir. 2009) ...........................................52

*Ortiz v. Jordan*,
    562 U.S. 180 (2011)...........................................................30

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Ouza v. City of Dearborn Heights*,
   969 F.3d 265 (6th Cir. 2020) ...................................................*passim*

*Parkell v. Danberg*,
   833 F.3d 313 (3d Cir. 2016) ...........................................................43, 50

*Pearson v. Callahan*,
   555 U.S. 223 (2009)..........................................................................37

*Peckham v. Wis. Dep't of Corr.*,
   141 F.3d 694 (7th Cir. 1998) ..........................................................50

*Rafferty v. Trumbull County*,
   915 F.3d 1087 (6th Cir. 2019) ........................................................45

*Regan v. Todd*,
   616 F. App'x 823 (6th Cir. 2015) ....................................................27

*Rhodes v. Michigan*,
   10 F.4th 665 (6th Cir. 2021) ......................................................44, 48

*Romo v. Largen*,
   723 F.3d 670 (6th Cir. 2013) ...........................................21, 28, 30

*Sexton v. Cernuto*,
   18 F.4th 177 (6th Cir. 2021) ......................................................45, 47

*Shorter v. Baca*,
   895 F.3d 1176 (9th Cir. 2018) ........................................................43

*Small v. Brock*,
   963 F.3d 539 (6th Cir. 2020) ....................................................54, 55

*Stanfield v. City of Lima*,
   727 F. App'x 841 (6th Cir. 2018)....................................................47

*Stoudemire v. Mich. Dep't of Corr.*,
   705 F.3d 560 (6th Cir. 2013) ................................................. *passim*

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Sumpter v. Wayne County*,
  868 F.3d 473 (6th Cir. 2017) ..................................................*passim*

*Swain v. Spinney*,
  117 F.3d 1 (1st Cir. 1997)...................................................43

*Thomas v. Bauman*,
  835 F. App'x 5 (6th Cir. 2020) ............................................29

*Thompson v. Grida*,
  656 F.3d 365 (6th Cir. 2011) ..............................................27

*Turkmen v. Hasty*,
  789 F.3d 218 (2d Cir. 2015) ...............................................43

*United States v. Budd*,
  496 F.3d 517 (6th Cir. 2007) ..............................................35

*United States v. Bunke*,
  412 F. App'x 760 (6th Cir. 2011) ........................................35

*Vanderhoef v. Dixon*,
  938 F.3d 271 (6th Cir. 2019) ..............................................38

*Waddleton v. Jackson*,
  445 F. App'x 808 (5th Cir. 2011) ........................................44

*Wheeler v. City of Cleveland*,
  415 F. App'x 705 (6th Cir. 2011) ........................................32

*Whitley v. Albers*,
  475 U.S. 312 (1986).................................................18, 51

*Wilkins v. Gaddy*,
  539 U.S. 34 (2010)..................................................18, 51

*Williams v. Maurer*,
  9 F.4th 416 (6th Cir. 2021) ................................................48

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Wilson v. Seiter,*
    501 U.S. 294 (1991).........................................................................18, 51

*Younes v. Pellerito,*
    739 F.3d 885 (6th Cir. 2014) ..............................................23, 24, 28

**STATUTE:**

42 U.S.C. § 1997e(e)............................................................18, 52, 53, 54

# INTRODUCTION

The "precise scope" of this Court's interlocutory jurisdiction in a defendant's appeal from an order denying qualified immunity is whether "the plaintiff's version of facts demonstrates a violation of clearly established rights." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 277-278 (6th Cir. 2020).

Here is what happened according to Plaintiff-Appellee Karl Fugate. After Fugate, then a prisoner at Southern Ohio Correctional Facility, assaulted a corrections officer, cutting the officer's cheek with a piece of metal, other officers dragged Fugate into a room without cameras and beat him senseless. They battered Fugate, who was already pepper-sprayed and restrained, so badly that the prison doctor immediately called an ambulance to take him to a hospital emergency room.

When Fugate got back from the hospital, Defendant-Appellant Warden Ron Erdos ordered him to be held in solitary confinement—locked in a segregated and doubly-secured "J1 slammer-cell." On Fugate's first morning in solitary confinement, Erdos personally visited Fugate's cell and threatened, "If you do anything else to my staff, we're going to beat the fuck out of you again." But the true harassment began later that morning.

Under Erdos's orders, Fugate was strip searched *three times a day* for thirty days—*90 times* in total. Erdos's only purported justification was to uncover contraband weapons that Fugate supposedly could have been hiding underneath his

clothes.  But Fugate was in solitary confinement, and under Fugate's account, it was impossible for him get remotely close to other inmates or to otherwise obtain contraband of any kind.  On top of that, Erdos's then-governing "post-order" required slammer-cell inmates to be strip searched twice a day.  For only Fugate, however, Erdos ordered his men to conduct a *third* daily strip search between midnight and 2:00 a.m.  And to make the strip searches even more humiliating, Erdos ordered that Fugate's first and several subsequent strip searches be conducted by seven or eight men, far more than necessary to secure Fugate and search for weapons.

Erdos never concedes these facts.  Instead, his appellate arguments principally attack the District Court's conclusions that a reasonable jury could find that Erdos had no penological purpose for ordering Fugate's 90 strip searches and that he maliciously ordered them as punishment for Fugate's assault on his officer.  Only at the end of his opening brief does Erdos discuss whether Fugate's rights were clearly established.  But even then, Erdos proceeds on his own preferred set of facts, as though Fugate's facts never existed.

Once Fugate's version is accepted as true, as it must be, this case is straightforward.  Fugate had a clearly established Fourth Amendment right not to be strip searched without any penological purpose; a clearly established Fourth Amendment right not to be strip searched by more officers than those serving a

penological purpose; and a clearly established Eighth Amendment right not to be maliciously strip searched as a form of punishment. Erdos violated those rights.

This Court should either dismiss the appeal for lack of jurisdiction or affirm the District Court's denial of qualified immunity.

## STATEMENT OF JURISDICTION

This Court lacks jurisdiction over Erdos's appeal because it does not fall within the narrow exceptions permitting appeal of a non-final order. Erdos consistently—and impermissibly—challenges the "sufficiency" of the evidence the District Court relied upon when ruling that Erdos is not entitled to qualified immunity. *Ouza*, 969 F.3d at 276. When Erdos—nearing the end of his brief—does raise purely "legal argument[s]" (Opening Br. 38-47), he *still* "fails to concede the most favorable view of the facts" to Fugate and "instead relies solely on his version of the facts." *Adams v. Blount County*, 946 F.3d 940, 950-951 (6th Cir. 2020). This Court therefore lacks jurisdiction over the appeal. *Id.*; *see also Gillispie v. Miami Township*, 18 F.4th 909, 917 (6th Cir. 2021) (following *Adams* and dismissing entire appeal for this reason).

## STATEMENT OF THE ISSUES FOR REVIEW

1. Whether this Court lacks jurisdiction over the appeal because Erdos fails to accept Fugate's version of events at this stage and instead argues the evidence and an alternative version of facts.

3

2. Whether this Court lacks jurisdiction over Erdos's arguments at pages 17 through 36 of his opening brief because they impermissibly challenge whether sufficient evidence supports the District Court's view of the record.

3.  Whether, to the extent appellate jurisdiction exists, the District Court correctly ruled that a reasonable jury could find that Erdos ordered more officers than necessary to strip search Fugate on at least one occasion; that Erdos ordered Fugate's strip searches without *any* penological justification; and that Erdos maliciously ordered the strip searches as punishment for Fugate's assault on his officer.

4. Whether Fugate's Fourth Amendment right to not be strip searched by more officers than those serving a penological purpose was clearly established.

5. Whether Fugate's Fourth Amendment right to be free from strip searches performed without *any* penological purpose was clearly established.

6. Whether Fugate's Eighth Amendment right to be free from strip searches maliciously ordered as punishment was clearly established.

## STATEMENT OF THE CASE

### A. Factual Background.

Until June 2017, Plaintiff-Appellant Karl Fugate was incarcerated at the Southern Ohio Correctional Facility (SOCF) in Lucasville, Ohio.  Report & Recommendation, R.80, PageID# 1234.  Defendant-Appellee Ronald Erdos was

SOCF's warden at that time and remains the warden today. Erdos Declaration 1, R.61-4, PageID# 596. He is responsible for "overseeing all operations at SOCF." *Id.*

### 1. After Fugate assaults a prison guard, other guards beat Fugate so badly that he must be immediately hospitalized.

Fugate "had a long history with" Corrections Officer (CO) Michael Anderson. Fugate Deposition, R.78-1, PageID# 1137. At a previous disciplinary hearing, Anderson singled Fugate out for harsher punishment than other inmates who had broken the same rules, even though Fugate had been infraction-free "for a long time." *Id.* Anderson gave Fugate six months of "4B" time, which entails more isolation and restrictions, without giving 4B time to any of the other inmates, and then "laugh[ed] about it." *Id.* When making his weekly rounds, Anderson would randomly stop at Fugate's cell to threaten that he had at least a year of 4B time left. *Id.*, PageID# 1138. Anderson's threats and harassment were "constant." *Id.*, PageID# 1137.

In January 2017, Anderson presided over a hearing relating to Fugate's previous fight with another inmate. *Id.*, PageID## 1137-1138. Fugate had hoped that Anderson would change his security classification from level 4B to level 5B because it would have allowed Fugate to transfer to Ohio State Penitentiary (OSP). Use of Force Report, R.61-3, PageID# 535; Report & Recommendation, R.80, PageID# 1237. Anderson chose to keep Fugate at level 4B.

During the hearing and as Fugate had planned "prior to reaching the hearing room," Report & Recommendation, R.80, PageID# 1237 (citing Fugate Deposition, R.78-1, PageID## 1137-1138), Fugate assaulted Anderson, punching him in the face with a piece of metal.  Fugate Deposition, R.78-1, PageID# 1195.  The attack resulted in a one-inch laceration on Anderson's cheek that required medical attention. Report & Recommendation, R.80, PageID## 1237-1238.

That was the first, and only, time Fugate ever attacked prison staff.  Fugate Deposition, R.78-1, PageID# 1189.  Fugate's assault on Anderson was "motivated by Anderson's long-standing 'harassment.'"  Report & Recommendation, R.80, PageID# 1237 (quoting Fugate Deposition, R.78-1, PageID# 1167); *see also* Use of Force Report, R.61-3, PageID# 509 ("Inmate stated that I and Anderson had problems in the past is why I did it."); *id.*, PageID# 536 (same).[1]  Once Fugate attacked Anderson, he "[n]ever resisted" because he "had already d[one] what [he] wanted to do."  Fugate Deposition, R.78-1, PageID# 1145.  There was "no reason for [him] to resist at that point."  *Id.*

Immediately after the Anderson assault, other prison guards dragged Fugate to a room with no cameras and beat him so severely that he needed an ambulance to

---

[1] Erdos disputes this, claiming that Fugate's assault on his guard was motivated by Fugate's preference to go to OSP.  Opening Br. 2, 5, 25, 26, 29, 31.  Fugate expressly rejects this contention.  *See* Fugate Deposition, R.78-1, PageID## 1165-1167 ("Q: So did you not attack Mr. Anderson because you wanted to go to OSP?  A: No, that's not the reason why I did it.").

take him to a hospital emergency room.  Starting in the hearing room itself, COs Garth Fri and John McCoy tackled Fugate, delivering several closed-fist strikes to his face.  Report & Recommendation, R.80, PageID# 1238.  Other officers, including Brian Felts, then secured Fugate and led him to the infirmary, Fugate Deposition, R.78-1, PageID# 1147; Report & Recommendation, R.80, PageID# 1238—a room they chose because it has no cameras.  Fugate Deposition, R.78-1, PageID## 1161-1162; Report & Recommendation, R.80, PageID# 1239.  Walking to the infirmary, Felts sprayed Fugate's face with pepper spray, even though Fugate remained cuffed and secured.  Fugate Deposition, R.78-1, PageID## 1151-1152.  Fugate was "blinded instantly," *id.*, PageID# 1154, and began choking, *id.*, PageID# 1153.

Alone in the infirmary, Felts, Fri, and Corrections Lieutenant Edgel Eshem sat Fugate in a chair and beat him until he lost consciousness "multiple times."  *Id.*, PageID## 1155-1156, 1159; Report & Recommendation, R.80, PageID# 1239.  The three men punched Fugate to the ground, kicked him, lifted him back up, put him back in the chair, and then "another one would take his turn."  Fugate Deposition, R.78-1, PageID# 1158.  Fugate was "completely knocked out" when he hit the floor. *Id.*  The officers continued their beating, taunting that Fugate was "faking" his pain and loss of consciousness.  *Id.*  Fugate "thought they w[ere] going to kill" him.  *Id.*, PageID# 1164.

7

Shortly thereafter, Fugate saw a prison doctor, who took "one look" at him and ordered an ambulance. *Id.*, PageID# 1163. Fugate was immediately sent to the Ohio State University emergency room. Use of Force Report, R.61-3, PageID# 561 ("Sent to OSU ER"); Fugate Deposition, R.78-1, PageID## 1167-1171. In the ambulance, Fugate's "pain really started setting in." Fugate Deposition, R.78-1, PageID# 1169. His arm, head, and neck all throbbed, so much so that three years later, he was still taking medication for the "constant" pain. *Id.*; Fugate Photograph, R.54-1, PageID# 273 (photograph after the beating).

### 2. Erdos orders that Fugate be placed in solitary confinement and strip searched three times a day for thirty days.

When Fugate returned from the hospital late that night, Erdos ordered that he be locked in a J1 "slammer cell." Fugate Deposition, R.78-1, PageID# 1173; Erdos Declaration 1, R.61-4, PageID# 596. The J1 corridor is where inmates "who have committed the most violent offense[s]" are held. Erdos Declaration 1, R.61-4, PageID# 596. Five cells within J1 are "reserved for inmates deemed particularly dangerous," even more dangerous than the other J1 inmates. *Id.*, PageID# 597. These are called the "slammer cells," and because the cells are "so isolated," inmates are generally kept in them for no more than two weeks at a time. Fugate Deposition, R.78-1, PageID# 1204.

Slammer cells are not normal or "average segregation cell[s]." *Id.*, PageID# 1193. There is an extra set of bars "around the whole unit" and "no openings." *Id.*;

Report & Recommendation, R.80, PageID# 1241. So even if an inmate porter (or another unauthorized person) improperly accessed the J1 corridor, they would still have to open another locked gate to get anywhere close to a slammer-cell inmate. Fugate Deposition, R.78-1, PageID# 1193. There was thus no way for Fugate to obtain any contraband while in the slammer cell. *Id.*; Complaint, R.3, PageID## 47, 57.

Erdos personally visited Fugate's slammer cell at 4:00 a.m. the very first night Fugate was kept there—not yet 24 hours after the Anderson assault. Fugate Deposition, R.78-1, PageID# 1191. Erdos threatened, "if you do anything else to my staff, we're going to beat the fuck out of you again." *Id.* He also told Fugate, "you're going to stay right here," in slammer-cell solitary confinement. *Id.*

Around 6:30 that morning, roughly two hours after Erdos's visit, the "real" harassment started. *Id.* About "seven [COs] and a white shirt"[2] barged into Fugate's cell "like gang busters." *Id.*, PageID# 1192. The "same COs" that beat Fugate in the infirmary were among them, *id.*, PageID## 1200, 1208, and Fugate thought they had come to beat him a second time, *id.*, PageID# 1192. But he was wrong: An officer took Fugate to the shower and strip searched him, as the "white shirt" and the several other officers looked on. *Id.*; *see also id.*, PageID# 1194 ("multiple COs" conducted the first strip search).

---

[2] A prison "white shirt" supervises the COs. SJ Order, R.89, PageID# 1335 n.2.

Erdos ordered that Fugate be strip searched three times a day for the next thirty days, all while Fugate was isolated in the J1 slammer cell. *Id.*, PageID# 1202; Erdos Declaration 1, R.61-4, PageID# 596. The searches occurred after each of the COs' three shifts: Around 6:30 a.m., 2:00 p.m., and midnight (but sometimes stretching until 2:00 a.m.). Fugate Deposition, R.78-1, PageID## 1196, 1199-1200, 1203. A "post order" required that every J1 slammer-cell inmate be strip searched after the first and second CO shifts. Erdos Declaration 1, R.61-4, PageID# 597; Fugate Deposition, R.78-1, PageID# 1198.[3] Erdos ordered that Fugate "additionally be searched during third shift" on top of the two other strip searches performed earlier each day. Erdos Declaration 1, R.61-4, PageID# 597. On January 18, the morning the strip searches began, Captain James Whitman e-mailed other prison staff: "Per Warden Erdos Inmate Fugate is to be shookdown at the beginning of every shift!!!" Whitman E-mail, R.54-1, PageID# 281. Later in the month, Fugate asked Erdos when the strip searches would end. Fugate Deposition, R.78-1, PageID# 1197. Erdos responded, "when I feel like it." *Id.*, PageID# 1198.

The strip searches were "humiliat[ing]." *Id.*, PageID# 1208. The same officers that beat Fugate in the infirmary ordered him to strip, to bend over, and to spread his buttocks. *Id.*, PageID## 1200, 1208-1209. They would "laugh[]" and

---

[3] No copy of the post order is in the record, and there is nothing to indicate the date or reason it was entered, or if it was ever rescinded. Report & Recommendation, R.80, PageID# 1241 n.12.

10

"mak[e] jokes" as they told Fugate to "spread your cheeks." *Id.*, PageID# 1209.
Like Fugate's first strip search, many subsequent searches were conducted with one
CO securing Fugate, while several others and the white shirt looked on as he stripped
naked and bent over. *Id.*, PageID# 1193 ("[A]fter 2:00 that day they came there
again."). Other of Fugate's strip searches were performed by one CO and one white
shirt. *Id.*, PageID# 1197.

No contraband was ever discovered in Fugate's cell or on his body during
these 90 strip searches. Erdos Declaration 1, R.61-4, PageID# 597. And after the
30-day period, Fugate was not strip searched again even though he was kept in the
J1 slammer cell for another "month or two." Fugate Deposition, R.78-1, PageID#
1207. Fugate suspects that the strip searches abruptly ended because the Ohio
Highway Patrol began investigating the infirmary beating that landed Fugate in the
emergency room. *Id.* Fugate was then placed in one of J1's "normal" non-slammer
cells, where he "was pretty much left alone." *Id.* In June 2017, Fugate was
transferred to OSP and out of SOCF. Erdos Declaration 1, R.61-4, PageID# 597.

## B. Procedural Background.

### 1. Fugate files suit in the Southern District of Ohio.

Proceeding pro se, Fugate sued Erdos, Eshem, Felts, Fri, and McCoy for
violating his rights under the Fourth and Eighth Amendments. Complaint, R.3,
PageID## 40, 50. He sued Eshem, Felts, and Fri under the Eighth Amendment for,

11

among other things, the "brutal" infirmary beating they inflicted after Fugate was pepper sprayed and fully secured. *Id.*, PageID# 45. And he sued Erdos under the Fourth and Eighth Amendments for ordering the strip searches, which Fugate alleged Erdos ordered solely in "retaliation," or "punishment," for the Anderson assault. *Id.*, PageID## 47, 49.

The case was referred to Magistrate Judge Stephanie K. Bowman and proceeded to discovery. When discovery concluded, both sides filed for summary judgment.

### 2. The District Court denies summary judgment to Felts and Eshem for the infirmary beating.

The Magistrate recommended denying summary judgment to Felts and Eshem for the vicious infirmary beating. The Magistrate zeroed in on video footage that showed Fugate with "no visible injuries" *before* he was taken inside the infirmary, and then compared that to the severe injuries he sustained *after* leaving the infirmary—injuries that required immediate "transport[] to an outside hospital emergency room." Report & Recommendation, R.80, PageID# 1248; *see also* Fugate Photograph, R.54-1, PageID# 273 (photograph of Fugate after the beating). Felts and Eshem did not dispute being alone with Fugate in the infirmary during this time. Felts Declaration, R.61-9, PageID# 610; Eshem Declaration, R.61-10, PageID## 611-612. On that basis, and in conjunction with Fugate's testimony, the

12

Magistrate recommended denying summary judgment and qualified immunity to Felts and Eshem.  Report & Recommendation, R.80, PageID## 1248-1249.

The District Court adopted these portions of the Magistrate's Report and Recommendation.  *See* SJ Order, R.89, PageID## 1343-1345.  Felts and Eshem have not appealed these orders, and Fugate's claims against them are set for a jury trial.

### 3. The District Court rules several material facts relevant to the strip-search claims against Erdos are genuinely disputed.

The District Court ruled that several material facts are genuinely disputed. Three are relevant to Erdos's appeal.  *First*, Fugate testified that his initial strip search, and more later on, were conducted in full view of a sizeable audience—seven COs and a white shirt—while most of the 90 strip searches were conducted privately with just one CO and one white shirt.  Fugate Deposition, R.78-1, PageID## 1191-1193, 1197.  Although Erdos and others denied that allegation, the District Court ruled that a reasonable jury could "infer[] that on at least one occasion, Plaintiff was observed by more officers than was necessary for any penological purpose."  SJ Order, R.89, PageID# 1335 (quoting Report & Recommendation, R.80, PageID# 1252).  The District Court further ruled that it was genuinely disputed whether Erdos personally ordered the strip searches to be conducted in this "manner," highlighting evidence of Erdos's malice and his (uncontested) direct orders to conduct the strip searches in the first place.  *Id.*, PageID# 1337.

*Second*, Erdos stated that he ordered Fugate to be strip searched three times a day while he was in the slammer cell out of concern he could obtain "weapons." Erdos Declaration 1, R.61-4, PageID# 597; *see also* Erdos Declaration 2, R.73-1, PageID# 1108.  In response, Fugate provided sworn testimony that there was "no way" for him to obtain contraband while in the slammer cell because it was completely segregated and secured with two sets of locked doors.  Fugate Deposition, R.78-1, PageID# 1193.  The District Court ruled that a "reasonable juror could find" in Fugate's favor on this point.  SJ Order, R.89, PageID# 1338.

The District Court summed it up:  If a jury "adopted" Fugate's "version" of events—which it could reasonably do—"then he had no access to contraband while housed in J1 and Warden Erdos therefore had *no* penological justification for the strip searches."  *Id.*, PageID# 1342 (emphasis added); *see also id.*, PageID# 1340 ("This is enough evidence to inject a factual dispute as to whether Warden had a penological reason for continuing the searches.").

*Third*, Erdos stated that he was "motivated by security concerns based upon [Fugate's] prior assaults."  Report & Recommendation, R.80, PageID# 1256; Erdos Declaration 1, R.61-4, PageID# 597.  Fugate testified that because it was impossible for the strip searches to uncover contraband, Erdos ordered them as "harassment," or punishment, for the Anderson assault.  Fugate Deposition, R.78-1, PageID## 1191,

14

1193.   The Magistrate considered Fugate's testimony, along with other record evidence that Erdos acted with malice:

- Around 4:00 a.m. on Fugate's first night in the slammer cell, Erdos breached "normal procedure" to personally tell Erdos "you're going to stay right here." Report & Recommendation, R.80, PageID# 1253.

- The sheer "frequency, number, and type of strip searches—involving 90 visual body-cavity inspections within 30 days" suggests Erdos was motivated by something aside from security concerns.  *Id.*

- Erdos assigned Felts and Eshem—the same officers who just viciously beat Fugate—to perform the strip searches.  *Id.*

- The slammer cells "are both more secure and more isolated than other cells in J1," yet Erdos did not order any strip searches for inmates in those other, *less* secure, *less* isolated cells.  *Id.*, PageID# 1255.

- Erdos "singled out" Fugate for an additional third daily strip search to be performed around midnight—going above and beyond the post order for other slammer-cell inmates.  *Id.*, PageID# 1256.

- All of Fugate's strip searches stopped "abruptly after 30 days" even though Fugate remained in the same J1 slammer cell for at least another month, with the same purported ability to obtain contraband.  *Id.*  The Magistrate noted Fugate's suspicion that this sudden cessation was connected with the Ohio Highway Patrol's investigation.  *Id.*, PageID# 1256 n.20.

- Fugate asked Erdos when the strip searches would end.  Erdos's response: "When I feel like it."  *Id.*, PageID# 1257.

The District Court adopted the Magistrate's recommendation that this evidence created a genuine dispute over whether Erdos acted with "malice" and ordered Fugate's 90 strip searches as punishment for the Anderson assault.  SJ Order, R.89, PageID# 1342.

**4.  The District Court rules that under Fugate's version of events, Erdos violated Fugate's clearly established rights under the Fourth and Eighth Amendments.**

The District Court ruled that under Fugate's facts, Erdos violated Fugate's Fourth and Eighth Amendment rights in three distinct ways.  It further ruled that Fugate's rights were clearly established and that Erdos lacked qualified immunity.

**a.  Fugate's Fourth Amendment right not to be strip searched "by more officers" than those serving a penological purpose.**

The District Court ruled that by ordering "a more-than-necessary number of officers" to strip search Fugate, Erdos independently violated Fugate's Fourth Amendment rights.  SJ Order, R.89, PageID# 1337.  Ruling that Fugate's right was clearly established, the court denied Erdos's request for qualified immunity.  *Id.*, PageID## 1340-1342.  The District Court explained that *Stoudemire v. Michigan Department of Corrections*, 705 F.3d 560 (6th Cir. 2013), applies "precise[ly]" and "neatly."  SJ Order, R.89, PageID# 1341.  *Stoudemire* held that "it is settled" that the law "restricts the scope, manner, and place" of a strip search.  705 F.3d at 574.  And specifically, *Stoudemire* recognized that inmates have a "well established right" not "to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest."  *Id.* at 575 (emphasis omitted).

### b. Fugate's Fourth Amendment right not to be strip searched without any penological justification.

The District Court held that Fugate's right to be free from strip searches without any "penological justification" also was clearly established after *Stoudemire*. SJ Order, R.89, PageID## 1341-1342.  The District Court interpreted *Stoudemire* to hold that strip searches must be performed with *some* "penological justification." *Id.*, PageID# 1341 (quoting *Stoudemire*, 705 F.3d at 575).  And the District Court explained that *Sumpter v. Wayne County*, 868 F.3d 473, 484 (6th Cir. 2017), held that a key consideration for qualified immunity is whether the inmate contests the validity of the official's proffered justification.  SJ Order, R.89, PageID# 1341.

Here, the potential discovery of hidden weapons was the *single* justification Erdos offered for Fugate's 90 strip searches, and Fugate directly contested it.  *Id.*, PageID# 1342 ("If Plaintiff's version of the facts is adopted, then he had no access to contraband while housed in J1 and Warden Erdos therefore had no penological justification for the strip searches.").  The District Court therefore ruled that under Fugate's version, Erdos was not entitled to qualified immunity.  *Id.*; *see also* Report & Recommendation, R.80, PageID# 1260 (Erdos "should have known that conducting thrice-daily strip searches devoid of any legitimate penological justification was constitutionally unreasonable.").

17

### c. Fugate's Eighth Amendment right not to be maliciously strip searched as a form of punishment.

The District Court held that Fugate had a clearly established Eighth Amendment right not to be "maliciously" strip searched in a way designed to "cause harm." SJ Order, R.89, PageID# 1342. The District Court adopted the Magistrate's analysis, which reasoned that Fugate's Eighth Amendment right was clearly established under *Hudson v. McMillian*, 503 U.S. 1 (1992); *Whitley v. Albers*, 475 U.S. 312 (1986); *Wilson v. Seiter*, 501 U.S. 294 (1991); and *Wilkins v. Gaddy*, 539 U.S. 34 (2010). *See* Report & Recommendation, R.80, PageID## 1244, 1259, 1261. Because Fugate's version showed that Erdos maliciously ordered the strip searches as punishment, *see supra* at 15, the District Court ruled that Erdos was not entitled to qualified immunity for this claim. SJ Order, R.89, PageID# 1342.

### 5. The District Court rejects Erdos's 1997e(e) argument.

"When addressing" Erdos's qualified immunity defense, the Magistrate sua sponte analyzed whether 42 U.S.C. § 1997e(e) blocks Fugate's Eighth Amendment claim because it does not "involve physical injury." SJ Order, R.89, PageID## 1342-1343. The Magistrate recommended that Fugate's claim be permitted to proceed under *King v. Zamiara*, 788 F.3d 207, 213 (6th Cir. 2015). *See* Report & Recommendation, R.80, PageID# 1261. Over Erdos's objections, the District Court adopted that recommendation, though when it did, the District Court analyzed

18

Erdos's Section 1997e(e) arguments separately from his qualified immunity arguments. *See* SJ Order, R.89, PageID## 1342-1343.

### 6. Erdos files this interlocutory appeal.

Erdos, and only Erdos, filed a notice of appeal challenging the District Court's summary judgment order denying qualified immunity. Notice of Appeal, R.90, PageID# 1346. Because the District Court's order is not final, Erdos seeks review under this Court's interlocutory jurisdiction. Fugate's claims against Felts, Eshem, and Erdos remain pending in the District Court.

## SUMMARY OF THE ARGUMENT

This Court should either dismiss the appeal for lack of jurisdiction or affirm the District Court's denial of qualified immunity. This Court's interlocutory jurisdiction over a qualified-immunity appeal is narrow, and Erdos exceeds it in two ways. *First*, to unlock this Court's interlocutory jurisdiction, the defendant must "concede the plaintiff's version of the facts." *Gillispie v. Miami Township*, 18 F.4th 909, 917 (6th Cir. 2021). By proceeding entirely on *his* own facts favorable to *his* side of the story, Erdos fails to satisfy that "crucial jurisdictional prerequisite." *Id.* That failure deprives this Court of jurisdiction "entirely." *Id.* at 918; *see infra* Argument I.

*Second*, even if Erdos had satisfied that jurisdictional directive, this Court is still not empowered to consider arguments challenging a district court's ruling that

certain facts are genuinely disputed and that particular inferences may be drawn from those facts. But here too, the bulk of Erdos's opening brief (at 15-36) attacks the District Court's ruling that there are genuine disputes over whether Erdos ordered several officers to watch, but not facilitate, at least one strip search; whether he ordered all 90 strip searches without *any* penological justification; and whether he ordered those strip searches maliciously as punishment. If the Court has any jurisdiction at all, these fact-based challenges must be "discard[ed]." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015). In any event, Erdos's record-based arguments fail on the merits. Once Fugate's testimony is accepted as true and inferences are drawn in his favor, the District Court's view of the record naturally follows. *See infra* Argument II.

*Third*, on the merits, the District Court was correct to deny Erdos qualified immunity because Fugate's account gives rise to two violations of his clearly established Fourth Amendment rights and a separate violation of his clearly established Eighth Amendment rights. To start, this Court has held that an inmate's "right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest" is clearly established. *Stoudemire*, 705 F.3d at 575 (emphasis omitted). Erdos violated that right by ordering an audience of eight men—six more

than those serving any penological interest—to watch several of Fugate's strip searches, including his first.  *See infra* Argument III.A.

Next, Sixth Circuit and other appellate case law clearly establishes the Fourth Amendment right to be free from strip searches performed without *any* penological justification.  Because Fugate directly and persuasively contradicted the *single* penological justification Erdos offered, Erdos is not entitled to qualified immunity on Fugate's second Fourth Amendment theory, either.  *See infra* Argument III.B.

Finally, precedent from this Court and others clearly establishes Fugate's Eighth Amendment right to be free from strip searches performed "maliciously" as a form of punishment.  *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992).  Because ample evidence shows that Erdos ordered Fugate's 90 strip searches with malice, he is not entitled to qualified immunity on Fugate's Eighth Amendment claim.  *See infra* Argument III.C.

## STANDARD OF REVIEW

"This Court reviews de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds."  *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020).  When reviewing a district court's denial of qualified immunity, this Court must "take, as given, the facts that the district court assumed when it denied summary judgment."  *Romo v. Largen*, 723 F.3d 670, 675 (6th Cir. 2013) (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)); *see also*

*Gillispie*, 18 F.4th at 916 ("This court simply 'defers to the district court's determinations of fact.'" (quoting *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020))).

## ARGUMENT

### I.     BECAUSE ERDOS IS UNWILLING TO CONCEDE FUGATE'S VERSION OF THE FACTS, THIS COURT LACKS JURISDICTION OVER THE ENTIRE APPEAL.

To activate interlocutory jurisdiction, the defendant must "concede the plaintiff's version of the facts for purposes of the appeal." *Gillispie*, 18 F.4th at 917 (quoting *Ouza*, 969 F.3d at 277; *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010)). The "onus" is on Erdos to satisfy this requirement. *Id*. at 915. He fails to do so, and that failure "strips" this Court of "jurisdiction entirely." *Id.* at 918.

At every turn, Erdos's opening brief refuses to concede, and even directly challenges, Fugate's version of the facts. For starters, Erdos fails to acknowledge that officers who report directly to him brutally beat Fugate as punishment for the Anderson assault. Glaringly, he never concedes that the beating even occurred. Erdos also never concedes that at 4:00 a.m. the morning after the beating—right before the strip searches began—he walked to Fugate's slammer cell to personally threaten: "[I]f you do anything else to my staff, we're going to beat the fuck out of you again." Fugate Deposition, R.78-1, PageID# 1191. Nor does Erdos mention the constellation of other facts, *see supra* at 15 (bullet-pointed list), showing that he

maliciously ordered Fugate's 90 strip searches to harass, humiliate, and punish Fugate. *See Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014) (dismissing entire appeal for lack of jurisdiction because defendant's "arguments dismiss or ignore relevant aspects of [plaintiff]'s account").

Far from making concessions, Erdos highlights *his* facts, favorable to *his* side of the story, even though Fugate's evidence and testimony directly contradicts them. *See Adams*, 946 F.3d at 951 (dismissing entire appeal for lack of jurisdiction where the defendant relied "solely on his version of the facts"). Strikingly, the opening brief cites Erdos's first declaration (R.61-4) thirty-six times. Relying on his own testimony, Erdos asserts repeatedly that additional security measures were necessary because Fugate's motive for attacking Anderson was "to obtain a transfer" to OSP. *See* Opening Br. 2; *see also id.* at 5-6, 9-10, 25. He argues that he imposed the three-a-day strip searches because he "had reasonable concerns that Fugate would attack somebody else until he got the transfer he sought." *Id.* at 29; *see also id.* at 2 (describing Fugate's allegedly "drastic" plan to "obtain the transfer to OSP he so desperately sought."); *id.* at 31 (similar), *id.* at 36 (similar).

But Fugate's evidence specifically contradicts that rationale. Fugate testified that he assaulted Anderson because Anderson had a "long history" of harassing him. Fugate Deposition, R.78-1, PageID# 1137-1138. On Fugate's account, he planned to assault Anderson *before* his transfer request was denied. *Id.*, PageID## 1137-

1138; Report & Recommendation, R.80, PageID# 1237.  And he testified that once the Anderson assault was over, he had no reason to "resist" because attacking Anderson is all he ever planned to do.  Fugate Deposition, R.78-1, PageID# 1145.  Moreover, Fugate expressly refuted Erdos's version that he assaulted Anderson in response to the transfer denial.  *Id.*, PageID# 1166-1167 ("No, that's not the reason I did it.").

Similarly, Erdos asserts that Fugate might have gotten "passed a weapon by inmate porters" while locked in the slammer cell.  Opening Br. 26.  Fugate directly contradicted that, too.  He testified that with no opening and two sets of locked doors, it was impossible for him or any other slammer-cell inmate to obtain contraband.  Fugate Deposition, R.78-1, PageID# 1193; Report & Recommendation, R.80, PageID# 1257.  Standing alone, these contradictions suffice to strip this Court of jurisdiction.  *See Younes*, 739 F.3d at 889 (the Court lacks interlocutory jurisdiction where "plaintiff has disputed" facts defendant relies upon).

Lastly, and importantly, the "clearly established" arguments Erdos makes at the end of his opening brief (at 37-44) do not cure these jurisdictional defects.  As this Court recently reiterated:  Even if a defendant ultimately "asserts arguments about whether the law was clearly established," this Court "cannot consider those otherwise valid arguments" if the defendant has "fail[ed] to concede the most favorable view of the facts to the plaintiff."  *Gillispie*, 18 F.4th at 917.  When factual

disputes are "minor" or "immaterial to the legal issues," *id.* at 917, this Court may "excise" a defendant's prohibited fact-based challenge "so as to establish jurisdiction" and consider a defendant's purely legal challenges. *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). But where "disputed factual issues are 'crucial to' a defendant's interlocutory qualified immunity appeal," the Court "remain[s] 'obliged to dismiss the appeal for lack of jurisdiction.'" *Gillispie*, 18 F.4th at 916 (quoting *Adams*, 946 F.3d at 951).

Plainly, Erdos's factual challenges are "more than 'minor'" and "not 'immaterial to the legal issues raised.'" *Id.* at 917 (quoting *Adams*, 946 F.3d at 951)). For Fugate's Fourth Amendment claim, Erdos argues that he is entitled to qualified immunity because "*Stoudemire* would not have put [him] on notice that subjecting Fugate to three strip-searches a day would violate" the Constitution. Opening Br. 41. But Erdos leaves out the most important fact. He never analyzes whether *Stoudemire* put him on notice "that subjecting Fugate to three strip-searches a day *without any penological purpose* would violate" the Constitution. Erdos never asks that question because—throughout his entire brief—he is unwilling to concede Fugate's version of the facts.

Erdos takes that same approach when claiming qualified immunity for Fugate's Eighth Amendment claim. He asserts that "[n]either *Hudson* nor *Wilkins* would have put every reasonable official on notice that the ordering of thrice daily

25

searches, in the wake [of] a violent attack by an inmate, is unlawful." Opening Br. 42 (internal quotation marks omitted). But the relevant legal question is whether Erdos had notice that he could *maliciously* impose strip searches as a form of punishment. Erdos fails to ask that question because he never stops disputing Fugate's account.

Erdos is unwilling "to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Gillispie*, 18 F.4th at 916. He thus fails to satisfy a "crucial jurisdictional prerequisite," and the entire appeal should be dismissed for lack of jurisdiction. *Id.* at 917.

## II. THIS COURT LACKS JURISDICTION TO CONSIDER ERDOS'S RECORD-BASED ARGUMENTS, WHICH ARE MERITLESS IN ANY EVENT.

The District Court held that the following facts are genuinely disputed:

- Erdos was personally "involve[d]" in the decision to have eight people (all seven COs and the supervising officer) witness at least one of Fugate's strip searches. SJ Order, R.89, PageID# 1337.

- Erdos did not have *any* "penological purpose" for ordering Fugate's 90 strip searches, and his proffered security interests are non-existent. Report & Recommendation, R.80, PageID## 1257-1258; SJ Order, R.89, PageID# 1338 (adopting this recommendation).

- Erdos maliciously ordered the 90 strip searches to punish Fugate for the Anderson assault. Report & Recommendation, R.80, PageID## 1258-1259; SJ Order, R.89, PageID## 1339-1340 (adopting this recommendation).

Erdos devotes pages 15 to 36 of his opening brief to challenging these fact-intensive rulings. This Court lacks jurisdiction to consider these arguments, which are wrong on the merits regardless.

A. This Court's interlocutory jurisdiction extends only as far as "abstract legal issues." *Downward for Estate of Downward v. Martin*, 968 F.3d 594, 599 (6th Cir. 2020). It conversely lacks jurisdiction "to review a district court's determination of 'evidence sufficiency, i.e., which facts a party may, or may not be able to prove at trial,'" *Ouza*, 969 F.3d at 276 (quoting *Bunkley*, 902 F.3d at 559), or its decision on whether "the pretrial record sets forth a 'genuine' issue of fact." *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019); *see also Adams*, 946 F.3d at 948.

Erdos's "summary judgment" arguments (at Opening Br. 15-36) disregard those limits. *First*, Erdos attacks the District Court's ruling that a reasonable jury could conclude that Erdos *personally* ordered eight men, six more than necessary, to watch at least one of Fugate's strip searches. Opening Br. 23-25. But this Court's precedents could not be clearer: A district court's "determination that the summary judgment record raises a genuine issue of fact concerning the officials' involvement is not an immediately appealable final decision and this Court lacks jurisdiction" to consider it. *Regan v. Todd*, 616 F. App'x 823, 825 (6th Cir. 2015) (quoting *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011)). Just last month, this Court reaffirmed that jurisdictional rule. *See Lippett v. Corizon Health, Inc.*, No. 20-1700,

2022 WL 304955, at *3 (6th Cir. Feb. 2, 2022) (defendant's argument that she "was [not] personally involved in the alleged decision" that violated the inmate's constitutional rights "boils down" to an improper "claim of evidence sufficiency").

The particular ways Erdos presses this argument raise even more jurisdictional roadblocks. He asserts that there is "no evidence" connecting Erdos to the eight men that watched Fugate's first strip search. Opening Br. 24. Going further, he even argues that there is "no evidence" that more officers than necessary watched that first strip search. *Id.* at 23. But arguing "no evidence" is a classic "evidence sufficiency" argument and therefore goes beyond this Court's jurisdiction. *See Barry v. O'Grady*, 895 F.3d 440, 444-445 (6th Cir. 2018) (no jurisdiction to "entertain" such arguments "whatever the merits"); *Younes*, 739 F.3d at 890 (similar); *Kindl v. City of Berkley*, 798 F.3d 391, 399 (6th Cir. 2015) (claims of "no evidence" are "arguments merely of 'evidence sufficiency'" and "are therefore beyond [this Court's] jurisdiction"). Erdos also argues that the District Court was wrong to "infer[]" that Erdos may have directed the eight men to be there. Opening Br. 23. This Court lacks interlocutory jurisdiction to review those arguments, as well. *Kindl*, 798 F.3d at 400 (permitting this Court to "review the 'inferences' to be drawn from the factual record" would be "contrary to both Sixth Circuit and Supreme Court precedent"); *see also DiLuzio*, 796 F.3d at 609 (similar) (citing *Romo*, 723 F.3d at 673-674).

28

*Second*, Erdos asserts that "[c]ontrary to the District Court's findings," a reasonable jury would have to find that he *did* have a penological justification for ordering Fugate's 90 strip searches. Opening Br. 31; *see also id.* at 9-10, 31. Erdos points to his first declaration stating that Fugate could "get passed a weapon by inmate porters," *id.* at 26 (citing Erdos Declaration 1, R.61-4, PageID# 597) and that Fugate "might attack another inmate or staff until he got the transfer he desperately sought," *id.* (citing Erdos Declaration 1, R.61-4, PageID# 597), and to his second declaration stating that "contraband had been smuggled to a slammer cell previously." *Id.* at 28 (citing Erdos Declaration 2, R.73-1, PageID# 1108).

The District Court, however, already exhaustively considered that evidence. *See* Report & Recommendation, R.80, PageID## 1255-1258) (discussing this exact evidence at length); SJ Order, R.89, PageID## 1337-1338 (adopting that analysis). The District Court then weighed Erdos's declarations against Fugate's conflicting testimony and ruled a reasonable jury could find that the 90 strip searches served *no* actual security concerns or other "penological purpose." Report & Recommendation, R.80, PageID# 1258; SJ Order, R.89, PageID## 1337-1338 (adopting that analysis).

Erdos simply asks this Court to re-weigh the evidence and come to the opposite conclusion—something it lacks jurisdiction to do. *E.g.*, *Thomas v. Bauman*, 835 F. App'x 5, 8 (6th Cir. 2020) (no interlocutory jurisdiction to consider

defendant's argument that "the district court did not give adequate weight to their 'side of the story'"); *McGrew*, 937 F.3d at 669 (similar); *Barry*, 895 F.3d at 442 (similar); *Ajami v. Saab*, 436 F. App'x 458, 461 (6th Cir. 2011) ("We do not have jurisdiction to reassess the weight of a plaintiff's evidence where the district court has already construed the facts in its denial of qualified immunity.").

*Third*, Erdos asserts that there is no evidence that he "acted maliciously and sadistically when he had Fugate strip searched every shift for thirty days." Opening Br. 34; *see also, e.g.*, *id.* at 2, 11, 35, 36. The District Court, however, expressly held a reasonable jury could conclude that "malice" motivated Erdos to order Fugate's 90 strip searches. SJ Order, R.89, PageID# 1342. In this posture, this Court lacks jurisdiction to review the fact-based question of "why an action was taken." *DiLuzio*, 796 F.3d at 609 (quoting *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011)); *see also Bey v. Falk*, 946 F.3d 304, 320 (6th Cir. 2019) ("Indeed, we have held that the limitation on our appellate jurisdiction applies with particular force to evidence sufficiency questions related to a person's intent." (internal quotation marks and alteration omitted)); *Kindl*, 798 F.3d at 398 (no interlocutory jurisdiction to consider "factual contention[s]" regarding defendant's mental state).

One last point: Ordinarily, this Court must "take, as given, the facts that the district court assumed when it denied summary judgment." *Romo*, 723 F.3d at 675; *Gillispie*, 18 F.4th at 916 (the Court usually "defers" to the district court's view of

the record) (quoting *Adams*, 946 F.3d at 948).  In rare instances, however, this Court

may review the district court's interpretation of the record when that interpretation

fails to properly assess "incontrovertible record evidence" or is "blatantly and

demonstrably false." *DiLuzio*, 796 F.3d at 609 (quoting *Austin v. Redford Twp.*

*Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012); *see also DeCrane v. Eckart*, 12

F.4th 586, 603 (6th Cir. 2021) (noting that this Court has drawn a jurisdictional

"line"); *Campbell v. Mack*, 777 F. App'x 122, 128 (6th Cir. 2019) (explaining this

framework).[4]

Neither exception applies or is even asserted by Erdos.  Erdos's arguments

rely primarily on Fugate's alleged plan to continue attacking prison guards until he

is transferred and his alleged ability to obtain a weapon while in the slammer cell.

*E.g.*, Opening Br. 2, 26, 34-35.  Fugate directly controverts both points.  *See supra*

at 23-24.  Similarly, Erdos never argues that Fugate's account is "blatantly" false.

*Kindl*, 798 F.3d at 399.  Nor could he, as no "clear video footage" or other evidence

reveal Fugate's testimony to be "demonstrably" untrue.  *Id*.; *see also Estate of*

*Barnwell by S.C.B. v. Grigsby*, 681 F. App'x 435, 440 (6th Cir. 2017) ("This 'one

limited exception' applies 'only where the evidence is so utterly discredited by the

---

[4] A defendant may also "point to some other of the *plaintiff's* record evidence" that
the district court did not consider.  *DiLuzio*, 796 F.3d at 611 (emphasis added).
Erdos's appellate arguments, however, are based on his own evidence, not Fugate's.

record as to be rendered a visible fiction.'" (quoting *Kollin v. City of Cleveland*, 557 F. App'x 396, 401 (6th Cir. 2014)).

In the end, pages 15 through 36 of the opening brief expressly "attack[] the district court's denial of summary judgment, not qualified immunity,"—arguments that do "not fit within an exception to [this Court's] lack of jurisdiction over interlocutory appeals." *Wheeler v. City of Cleveland*, 415 F. App'x 705, 709 (6th Cir. 2011). If this Court has any jurisdiction at all, it must "discard the fact-based or 'evidence sufficiency' portion" of Erdos's appeal—"that is, any challenge to the district court's view of the facts or its associated inferences." *DiLuzio*, 796 F.3d at 611. That requires disregarding pages 15 through 36 of Erdos's opening brief.

B.  In any event, Erdos's summary-judgment arguments lack merit. Once Fugate's testimony is accepted as true and inferences are drawn in his favor, the District Court's conclusions come naturally.

To begin, Erdos argues that there is "no evidence" that eight men watched at least one of Fugate's strip searches—six more than necessary. Opening Br. 23. That is false. Fugate stated that "seven [COs] and a white shirt" were present for his first strip search. Fugate Deposition, R.78-1, PageID# 1192. One CO performed the strip search, while "the rest" and the "white shirt" were "looking." *Id.* The deposing lawyer repeated that testimony back to Fugate. *Id.*, PageID# 1194 (referring to the "multiple COs that brought you out of your cell" to be strip searched). And Fugate

later confirmed that at least one other strip search was conducted in the same way. *Id.*, PageID# 1193 ("after 2:00 that day they came there again.").

Retreating, Erdos argues there was "no evidence linking" Erdos to the decision to have an audience of eight men watch at least one of Fugate's strip searches. Opening Br. 24. But the record shows that Erdos personally ordered the strip searches and held strong animus against Fugate—powerful *circumstantial* evidence that Erdos ordered the strip searches to be conducted in such a demeaning "manner." SJ Order, R.89, PageID# 1337. That is sufficient. "[T]his Court's cases only require enough evidence to support a reasonable inference that the defendant" was involved in the unconstitutional acts; direct evidence is not required. *See Abu-Joudeh v. Schneider*, 954 F.3d 842, 850 (6th Cir. 2020) (reversing district court for requiring more).

Next, Erdos asserts that a reasonable jury would have to find that he *did* have a penological purpose for strip searching Fugate. *See* Opening Br. 25-31. This argument mainly rests on Erdos's own testimony that it was possible for Fugate to obtain a contraband weapon while in the slammer cell and that Fugate planned a spree of attacks on other prison officials. *See id.* at 28-31. Again, Fugate's testimony directly contradicts these claims, *see supra* at 23-24, which suffices to create a "genuine issue of material fact" unless it is "blatantly contradicted by objective evidence." *Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011);

33

*Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011) (because "credibility determinations" are improper at summary judgment, the district court erred when it "endorse[d] the prison officers' account" over the prisoner's).

Erdos comes nowhere close to meeting that standard. He highlights his own second declaration, which stated that "contraband had been smuggled to a slammer cell previously." Opening Br. 28 (citing Erdos Declaration 2, R.73-1, PageID# 1108). But in the Magistrate's view, which the District Court adopted, a reasonable jury could afford that declaration little weight because Erdos never identified what type of contraband was discovered, when it was discovered, how the inmate obtained it, and "precisely where it was located on the inmate." Report & Recommendation, R.80, PageID# 1258 n.22; SJ Order, R.89, PageID# 1337-1338. Erdos never explains why that is incorrect. Nor does he explain—as he must—why "no reasonable juror could accept" Fugate's testimony after hearing the substance of Erdos's second declaration. *Coble*, 634 F.3d at 870 (quoting *Jones v. Garcia*, 345 F. App'x 987, 990 (6th Cir. 2009)). To the contrary, Erdos admits that his second declaration is based merely on his own "recollect[ion]," Opening Br. 28, not "objective evidence," *Coble*, 634 F.3d at 869.

Erdos falls back on his pleas for "deference," Opening Br. 25-28, and his assertion that Fugate was particularly "dangerous," *id.* at 29-31. Both ring hollow. Of course, prison officials "must have substantial discretion to devise reasonable

solutions to the problems they face." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012). But that deference is overcome with "substantial evidence" that Fugate's 90 strip searches were "unnecessary" for prison "security." *Id.* at 323; *see also* SJ Order, R.89, PageID# 1338 (quoting *Florence*, 566 U.S. at 323). And a reasonable jury could find that Fugate met that burden after accepting his testimony that there was no way for him to acquire contraband and crediting his extensive evidence showing that Erdos ordered the strip searches as punishment, not for prison safety. *See Stoudemire*, 705 F.3d at 572 ("[W]e must not confuse deference with abdication.").[5] Moreover, while at one point Fugate may have posed a real danger to prison guards, any safety "justification[s]" for the strip searches had "disappear[ed]" once Fugate was isolated in solitary confinement. *United States v. Bunke*, 412 F. App'x 760, 765 (6th Cir. 2011) (quoting *United States v. Budd*, 496 F.3d 517, 531 (6th Cir. 2007)); *see also* Report & Recommendation, R.80, PageID# 1256 ("Of course, dangerousness alone says nothing about the Plaintiff's ability to obtain contraband.").

---

[5] To be clear, the District Court's determination that a reasonable jury could find "substantial evidence" that the strip searches were "unnecessary," SJ Order, R.89, PageID# 1338, is a question of "evidence sufficiency" that this Court lacks interlocutory jurisdiction to review. *See supra* at 27-32; *cf. Cornwell*, 963 F.2d at 917 (as the fact-finder, the jury must afford "deference to prison officials" and then determine if there is "some valid, rational connection between the prison policy and a legitimate penological interest").

Finally, Erdos states that "there is a total lack of evidence supporting [Fugate's] contentions of Warden Erdos' alleged maliciousness and sadistic motive." Opening Br. 36. But here, Fugate presented *direct* evidence of Erdos's animus. He testified that on the morning that the strip searches began, Erdos threatened, "if you do anything else to my staff, we're going to beat the fuck out of you again." Fugate Deposition, R.78-1, PageID# 1191. Even setting that aside: "Because direct evidence of motive is difficult to produce, claims involving proof of a defendant's intent seldom lend themselves to summary disposition" and "circumstantial evidence" often suffices. *Kennedy v. City of Villa Hills*, 635 F.3d 210, 218 (6th Cir. 2011) (internal quotation marks omitted). And the District Court pointed to ample circumstantial evidence of Erdos's malicious intent. *See supra* at 15; SJ Order, R.89, PageID# 1337 (citing Report & Recommendation, R.80, PageID## 1252-1254). That is more than enough to survive summary judgment.

Either for lack of jurisdiction or on the merits, this Court should accept the District Court's rulings that a reasonable jury could conclude: (1) Erdos ordered eight officers (several more than necessary) to be present for at least one of Fugate's strip searches; (2) Erdos had *no* penological justification for ordering the strip searches; and (3) Erdos maliciously ordered the strip searches as a form of punishment.

### III.  VIEWING THE RECORD IN THE LIGHT MOST FAVORABLE TO FUGATE, ERDOS VIOLATED FUGATE'S CLEARLY ESTABLISHED RIGHTS IN THREE SEPARATE WAYS.

Under Fugate's account, Erdos violated his clearly established rights in three separate ways.  The District Court was correct to deny Erdos qualified immunity.

Officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A right can be clearly established either "by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-590 (2018).

For a right to be clearly established, there need not be "a case directly on point." *Id.* at 590; *see also Ouza*, 969 F.3d at 283 ("[T]his Court does not require 'a prior, precise situation,' a finding that 'the very action in question has previously been held unlawful,' or a 'case directly on point' in order to hold that a right was clearly established." (quoting *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019)). Instead, a right is clearly established where its "contours are sufficiently clear" that "a reasonable official would understand that what he is doing violates that right." *Carroll v. Carman*, 574 U.S. 13, 16 (2014).

The inquiry's "focus is on whether the officer had fair notice that her conduct was unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam).  And

"an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Ouza*, 969 F.3d at 283; *see also Vanderhoef v. Dixon*, 938 F.3d 271, 279 (6th Cir. 2019) (same).

The reasoning and holdings of this Court's case law, along with a robust consensus from sister Circuits, would place any reasonable official on notice that (1) directing eight officers (six more than necessary) to perform at least one of Fugate's strip searches violates his Fourth Amendment rights; (2) ordering strip searches without *any* penological purpose violates Fugate's Fourth Amendment rights; and (3) maliciously ordering strip searches as a form of punishment violates his Eighth Amendment rights.

### A. Fugate's Fourth Amendment Right Not To Be Strip Searched By More Officers Than Those Serving A Penological Purpose Was Clearly Established.

Based on Fugate's testimony, it was "possible to infer that eight people (all seven COs and the supervising officer) witnessed [his] initial search." SJ Order, R.89, PageID## 1335-1336. Yet, several other strip searches were conducted by a single CO and a white shirt. Fugate Deposition, R.78-1, PageID# 1197. Thus, the District Court ruled, Fugate's strip search was "observed by more officers than was necessary for any penological purpose" on "at least one occasion." SJ Order, R.89, PageID# 1335. That violated Fugate's clearly established Fourth Amendment right.

The District Court ruled Erdos is not entitled to qualified immunity because *Stoudemire* applies "neatly" and "precise[ly]." *Id.*, PageID# 1341. Correct. *Stoudemire*, decided four years before Fugate's 90 strip searches, held that the Fourth Amendment right "not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest" is clearly established. 705 F.3d at 575 (emphasis omitted). There, as here, the plaintiff was strip searched in front of an audience— instead of in private—with no "penological justification." *Id.* That is sufficient to put any reasonable official on notice that ordering six additional men to watch, but not facilitate, a strip search violated Fugate's Fourth Amendment rights.

Erdos offers no *legal* argument to the contrary—none. He offers solely record-based challenges that this Court lacks jurisdiction to consider, and that are wrong on the merits anyway. *See supra* at 27-28, 32-33; *e.g.*, Opening Br. 39 ("Fugate was searched in a shower, and was only observed by guards whose responsibility it was to conduct the search"). The District Court's ruling should therefore be affirmed. *E.g.*, *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) (per curiam) (denying qualified immunity at summary judgment where "the guards provided no justification for group searches because they denied performing them").

### B. Fugate's Fourth Amendment Right To Be Free From Strip Searches Performed Without *Any* Penological Purpose Was Clearly Established.

Under Fugate's version of events, it was impossible for him to obtain contraband or for the strip searches to uncover any. Erdos's purported security concerns were thus non-existent and pretextual, and he fails to offer any other penological justification. Applying those facts, Erdos violated Fugate's Fourth Amendment right to be free from strip searches performed without any penological purpose. SJ Order, R.89, PageID# 1342 (if there were no "access to contraband," the strip searches would lack a penological purpose); Report & Recommendation, R.80, PageID# 1257 ("[I]n the absence of some opportunity to gain contraband, a policy requiring frequent invasive strip searches would not be rationally related to its stated objective."). That right is clearly established, and Erdos's contrary arguments lack merit.

### 1. Case law clearly establishes an inmate's Fourth Amendment right to be free from strip searches performed without any penological interest.

Sixth Circuit case law clearly establishes Fugate's Fourth Amendment right to be free from strip searches performed without any penological purpose. Start with *Stoudemire*. There, a prison official strip searched an inmate in her cell without covering the window, allowing "people in the hallway" to see her. *Stoudemire*, 705 F.3d at 567. The Court concluded that because there was *no* penological interest in

40

performing the strip search "in view of other inmates and prison personnel," *id.* at 573-574, any "reasonable officer" would know the search was unlawful, *id.* at 575.

*Stoudemire* held that prison officials must have a "legitimate justification" for conducting a strip search. *Id.* at 573. On top of that, if the "location" or "manner" of the strip search makes it more invasive, prison officials must have an additional "need for th[at] *particular* search." *Id.* at 573-574; *see also id.* at 574 ("[I]t is settled that the law demands an adequate need for a strip search, and, depending on the circumstances and context, restricts the scope, manner, and place of the search."). The Court in *Stoudemire* ruled the strip search was unlawful after accepting—just as in this case—that it "was 'undertaken to harass or humiliate' and not for any legitimate purpose." *Id.* at 571. The Court denied qualified immunity because any reasonable officer knows that she may not impose strip searches "devoid of any legitimate penological justification." *Id.* at 575.

In *Sumpter*, this Court reaffirmed *Stoudemire*'s "no penological justification" qualified-immunity standard for strip searches. *Sumpter* applied the *Stoudemire* framework to grant qualified immunity to prison officials that ordered group strip searches to minimize "delays in the intake process." *Sumpter*, 868 F.3d at 484-485. In doing so, the Court reiterated that the Fourth Amendment balances the justification for a strip search against its attendant privacy invasion. *Id.* at 485. The Court emphasized that the *Sumpter* plaintiff "presented no evidence to dispute

[defendants'] asserted penological justification," i.e., the need to minimize intake delays. *Id.* at 484. And it denied qualified immunity after holding that no case instructed prison officials how to "weigh" that (valid) penological interest against the nature of the inmates' privacy invasion. *Id.* at 487. In *Stoudemire*, by contrast, there simply was no "penological justification[] to weigh against the nature of the intrusion." *Id.* (describing *Stoudemire*). That was "critical for purposes of qualified immunity analysis." *Id.* The "balancing test between weighty privacy interests on one hand and no governmental interest on the other was obvious," such that any "reasonable officer in the defendant's position" was on notice that ordering the search would be unlawful. *Id.*

This case is the same. Erdos ordered Fugate to be strip searched 90 times in 30 days with "no penological justification." SJ Order, R.89, PageID# 1342. Fugate's testimony directly negates Erdos's purported interest in confiscating weapons, the only penological interest he offers. *Compare* Fugate Deposition, R.78-1, PageID# 1193 (explaining there is "no opportunity" to obtain contraband in the slammer cell), *with* *Sumpter*, 868 F.3d at 484 (granting qualified immunity in part because plaintiff "fails to address the [penological] justification put forward by defendants"). Accepting Fugate's testimony as true, his Fourth Amendment right was "clearly established" because the "outcome" of a "balancing test" with "no governmental interest" is obvious. *Sumpter*, 868 F.3d at 487.

A "robust consensus" of other circuits agree. *Wesby*, 138 S. Ct. at 589-590. For decades, federal circuit courts have held that ordering strip searches that could not possibly uncover contraband violates an inmate's right to be free from strip searches performed without *any* penological purpose. In *Parkell v. Danberg*, the Third Circuit held that strip searching an inmate in an "isolation cell without human contact" violates the Fourth Amendment because it does not "advanc[e]" prison security or any other penological interest. 833 F.3d 313, 329 (3d Cir. 2016). The court then noted that "[i]n similar cases, our sister Courts of Appeals have allowed inmates to pursue Fourth Amendment claims after being subjected to bodily searches when they had had no opportunity to obtain contraband." *Id.* 329 n.10 (citing *Turkmen v. Hasty*, 789 F.3d 218, 261 n.44 (2d Cir. 2015); *Franklin v. Lockhart*, 769 F.2d 509, 510-511 (8th Cir. 1985); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983); *Bono v. Saxbe*, 620 F.2d 609, 617 (7th Cir. 1980)); *see also Swain v. Spinney*, 117 F.3d 1, 10 (1st Cir. 1997) ("visual body cavity search" when plaintiff was "alone in a monitored cell, posing no danger to others" is "a flagrant violation of the Fourth Amendment").

Other circuits hold the same. Long-standing precedent from the Ninth Circuit holds that strip searches violate the Fourth Amendment when they are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest." *Shorter v. Baca*, 895 F.3d 1176, 1189 (9th Cir. 2018) (quoting *Michenfelder v. Sumner*, 860

F.2d 328, 332-333 (9th Cir. 1988)).  Same for the Fifth Circuit.  *See Waddleton v. Jackson*, 445 F. App'x 808, 809 (5th Cir. 2011) (per curiam) (holding that the plaintiff sufficiently alleged Fourth Amendment violation where there was "no justification, penological or otherwise" for the strip search).

Even Erdos's brief acknowledges what any reasonable official reading this case law would understand:  "[A]n inmate can be strip-searched *so long as there is penological justification for the search*."  Opening Br. 9 (emphasis added).  Exactly.  Under Fugate's account, there was *no* penological justification for Erdos's 90 strip searches, and these cases tell any reasonable officer that ordering them would violate the Fourth Amendment.

## 2.  Erdos's qualified-immunity arguments fail.

Erdos's contrary theories lack merit.  *First*, Erdos claims that *Stoudemire* and *Sumpter* are off-base because, unlike here, those cases involved "other people," aside from the "assigned" guards, "see[ing] the person being stripped."  Opening Br. 39.

But *Stoudemire* specifically held that prison officials must offer a "valid reason for [strip] searching" a prisoner *and*, if the search was conducted in public, an "additional justification[] for strip searching [the prisoner] where others could see [him] naked."  705 F.3d at 574.  That provides more than sufficient notice that prison officials must have some penological justification before ordering *any* strip search—public or private.  *See Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021)

(qualified immunity's "sufficiently analogous" inquiry is whether the case law prompts a reasonable official to understand what he is doing is unconstitutional, not whether the case is "on all fours with the instant fact pattern"); *Sexton v. Cernuto*, 18 F.4th 177, 191 (6th Cir. 2021) (rejecting defendant's "overreliance on factual similarity"); *Rafferty v. Trumbull County*, 915 F.3d 1087, 1097 (6th Cir. 2019) (similar).

Indeed, *Stoudemire* rejected a nearly identical argument. The *Stoudemire* defendant conducted a public female-on-female strip search, at a time when Sixth Circuit case law had held that strip searches performed by the opposite sex were "particularly" invasive. *Stoudemire*, 705 F.3d at 575. The defendant argued that because the plaintiff did "not cite any cases involving same-sex strip searches," she did not have notice that her same-sex public strip search was unlawful. *Id*. This Court rejected that, holding that the defendant was "mistaken in suggesting that the gender of the parties involved is wholly dispositive." *Id.*; *see also id.* ("[Defendant]'s emphasis on the fact that this was not a cross-gender strip search is unavailing.").

Erdos similarly asserts that because *Stoudemire* and *Sumpter* did not involve private strip searches, they did not "put [him] on notice" that ordering private strip

searches without *any* penological interest would violate the Fourth Amendment.[6] Opening Br. 38. But just as the *Stoudemire* plaintiff was not required to offer Sixth Circuit cases involving same-sex strip searches, 705 F.3d at 575, Fugate is not required to offer Sixth Circuit cases involving private strip searches. Neither factor is "wholly dispositive." *Id.*; *cf. Sumpter*, 868 F.3d at 482 ("[V]isual strip searches conducted in private are themselves an offense to the dignity of the individual"). Then, as now, Sixth Circuit precedent was sufficiently clear that "a reasonable officer would have been on notice" that strip searches "*devoid* of any legitimate penological justification" violate the Fourth Amendment. *Stoudemire*, 705 F.3d at 575 (emphasis added); *Sumpter*, 868 F.3d at 487 (*Stoudemire* denied qualified immunity because the strip search was "devoid of justification").[7]

And where, as here, strip searches "deviat[e] from normal practice and prison policies," prison officials have even more "notice" that they are unlawful. *Barker v. Goodrich*, 649 F.3d 428, 436 (6th Cir. 2011); *see also Jacoby v. Mack*, 755 F. App'x 888, 904 (11th Cir. 2018) (per curiam) (denying qualified immunity where the plaintiff was "singled out" for strip searches that other similarly situated inmates did

---

[6] Of course, "at least one" of Fugate's 90 strip searches was not private. *See supra* at 38-39.

[7] In addition to the strong directives from this Circuit, substantial case law from around the country supplied confirmatory notice that some penological interest is required to conduct private strip searches. *See supra* at 43-44 (citing cases from the First, Second, Third, Fifth, Seventh, Eighth, and Ninth Circuits).

not receive).  Erdos "singled out" Fugate for an extra *third* daily strip search in the dead of night, Report & Recommendation, R.80, PageID## 1241, 1256, exceeding the two (already dubious) strip searches the post order imposed on slammer-cell inmates.  SJ Order, R.89, PageID# 1338 (ruling there is "substantial evidence placing in question the need for multiple strip searches a day of anyone housed in a slammer cell").  That is not a "bad guess[]" in a "gray area[]" that entitles Erdos to qualified immunity.  *Stanfield v. City of Lima*, 727 F. App'x 841, 849 (6th Cir. 2018).

*Second*, Erdos suggests that because Fugate's Fourth Amendment claim involves "ad-hoc interest-balancing," he must provide a case with identical facts.  Opening Br. 40 (quoting *Sumpter*, 868 F.3d at 485).  But Erdos "improperly ignores the constitutional violation that [Fugate] claims."  *Sexton*, 18 F.4th at 192.  Fugate claims there was *no* penological interest for his 90 strip searches, and thus, there is nothing to "weigh" in the balancing test.  *Sumpter*, 868 F.3d at 487.

*Third*, Erdos asserts that the right to be free from strip searches performed without any penological interest is "too general" to provide notice of the conduct it proscribes.  Opening Br. 41.  That is wrong.  Before ordering a strip search, officials are on notice that the practice "instinctively gives [this Court] the most pause."  *Sumpter*, 868 F.3d at 492; *Stoudemire*, 705 F.3d at 573 (a "strip search is a particularly extreme invasion" of Fourth Amendment rights (citing *Bell v. Wolfish*, 441 U.S. 520, 559-560 (1979)).  Thus, officials are not, as Erdos argues, operating

47

under "general rules" applicable in other situations.  Opening Br. 41.  Moreover, the outer limits of Fugate's clearly established right are precise:  Strip searches may not be *unrelated* to prison "security and order" or another "penological interest." *Stoudemire*, 705 F.3d at 571.  An official must point to some function the strip search serves aside from "harass[ing] or humiliat[ing]" the prisoner.  *Id*.  The "contours" of that right are "sufficiently clear."  *Carroll*, 574 U.S. at 16.[8]

Requiring Fugate to define his right more narrowly would "defeat[] the purpose of [Section] 1983."  *Ouza*, 969 F.3d at 280.  Acknowledging that "just as a court can generalize too much, it can generalize too little," *id.*, the Sixth Circuit has defined clearly established rights at a far higher level of generality.  *E.g.*, *Williams v. Maurer*, 9 F.4th 416, 437-438 (6th Cir. 2021) ("[I]t was clearly established that warrantless entry into a home without an exception to the warrant requirement violated clearly established law."); *see also Rhodes*, 10 F.4th at 680 ("knowingly or recklessly disregarding a known excessive risk to the prison worker's health and safety in that environment" is not "too general"); *Jackson v. City of Cleveland*, 925

---

[8] Erdos highlights *Sumpter*'s statement that declaring "strip searches must be supported by a legitimate justification" is too general for qualified immunity purposes.  Opening Br. 40 (quoting *Sumpter*, 868 F.3d at 487).  But under Fugate's facts, Erdos's purported "penological justifications" are "non-existent," something *Sumpter* readily holds violates an inmate's clearly established Fourth Amendment rights.  868 F.3d at 482, 486.  Whether a legitimate justification "*support[s]*" a strip search presents a question of balancing not at issue here.  *See id.* at 486, 487 (emphasis in original).

F.3d 793, 823 (6th Cir. 2019) (finding it "clearly established" that "prosecutorial withholding of exculpatory evidence" violates a defendant's constitutional right).

A jury should decide whether to believe Fugate's account, or affording him the proper deference, Erdos's. If the jury accepts Fugate's version and finds that the strip searches served *no* penological purpose, then Erdos is not entitled to qualified immunity.

### C. Fugate's Eighth Amendment Right To Be Free From Strip Searches Maliciously Imposed As Punishment Was Clearly Established.

Under Fugate's account, Erdos maliciously ordered him to be strip searched 90 times in 30 days to punish him for assaulting Anderson. If the jury believes Fugate, then Erdos violated his clearly established Eighth Amendment right.

#### 1. Case law clearly establishes Fugate's Eighth Amendment right to be free from strip searches maliciously ordered as punishment.

For at least thirty years, this Court has recognized that "prison security measure[s]," including strip searches, violate the Eighth Amendment if the force "was applied maliciously for the purpose of causing harm," rather than "in good faith to restore or maintain discipline." *Cornwell*, 963 F.2d at 917. Although the *Cornwell* plaintiff was strip searched after participating in a prison riot, the Court clarified that the Eighth Amendment's "malicious" strip-search standard applies both inside and "outside of the prison riot situation." *Id.* at 918.

49

Other circuits agree. Under remarkably similar facts, the Third Circuit held that "thrice-daily visual-body cavity searches" violate the Eighth Amendment when they are "undertaken maliciously." *Parkell*, 833 F.3d at 336. The Seventh Circuit, as well, has long held that the Eighth Amendment protects inmates from strip searches intended as "punishment." *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998). So too have the Second and Fifth Circuits. *See Crawford v. Cuomo*, 796 F.3d 252, 258 (2d. Cir. 2015) (strip searches "undertaken maliciously" violate the Eighth Amendment); *Cooke v. Nealy*, 166 F.3d 341, at *3 (5th Cir. 1998) (per curiam) (holding that plaintiff's direct evidence of a non-routine, retaliatory strip search stated an Eighth Amendment claim). Finally, the Eleventh Circuit has recognized that strip searches violate the Eighth Amendment when they are "devoid of penological merit"—imposed simply as "punish[ment]." *Harris v. Ostrout*, 65 F.3d 912, 915, 916 (11th Cir. 1995) (per curiam). Fugate's Eighth Amendment right was thus clearly established.

### 2. Erdos's sole qualified-immunity argument lacks merit.

Erdos asserts a single qualified-immunity argument: Neither *Wilkins* nor *Hudson*, two of the Supreme Court cases that the Magistrate cited when recommending the denial of qualified immunity, is sufficient to provide "notice" that maliciously ordering strip searches as punishment was unconstitutional. Opening Br. 42. Wrong again. When laying out the Eighth Amendment standard, the

Magistrate cited four Supreme Court cases:  *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Wilson*, 501 U.S. at 300; and *Wilkins*, 539 U.S. at 37.  *See* Report & Recommendation, R.80, PageID## 1244, 1259, 1261; SJ Order, R.89, PageID# 1342 (adopting this analysis).  And this Court has relied specifically on two of these *same* cases to apply the Eighth Amendment's maliciousness standard to strip searches.

In *Cornwell*, this Court directly quoted *Hudson* when holding that strip searches violate the Eighth Amendment if they are not "applied in a good-faith effort to maintain or restore discipline," but "maliciously and sadistically to cause harm." 963 F.2d at 918 (quoting *Hudson*, 503 U.S. at 7).  And it *expressly* held that the lower court's jury instruction laying out this maliciousness standard for strip searches "was in accord with the Supreme Court's holding in *Whitley v. Albers*."  *Id.* at 917; *cf. Crawford*, 796 F.3d at 258 (citing *Whitley* and *Hudson* for the proposition that strip searches "undertaken maliciously" violate the Eighth Amendment).  The Magistrate's third cited Supreme Court case, *Wilkins*, reaffirms the maliciousness standard that *Whitley* and *Hudson* set out decades before, *see* Report & Recommendation, R.80, PageID## 1244, 1261 (citing the sections of *Wilkins* that cite to *Whitley* or *Hudson*), and that this Court has directly applied to strip searches.

Erdos thus had ample notice that *Wilkins* and *Hudson*'s maliciousness standard applies here.

### 3. This Court lacks jurisdiction to consider Erdos's Section 1997e(e) argument, which fails on the merits regardless.

Erdos's main response is not about qualified immunity at all. He asserts that Fugate's Eighth Amendment claim is barred under 42 U.S.C. § 1997e(e), which is entitled "Limitation on recovery" and states, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." Opening Br. 43-48. This Court lacks jurisdiction to consider that argument, which fails on the merits regardless.

A. The collateral order doctrine gives the Court interlocutory jurisdiction over a district court's denial of qualified immunity. That doctrine applies only to decisions that: (1) "are conclusive"; (2) "resolve important questions separate from the merits"; and (3) "are effectively unreviewable" if not immediately reviewed. *Himmelreich v. Fed. Bureau of Prisons*, 5 F.4th 653, 659 (6th Cir. 2021). Denials of qualified immunity satisfy this third requirement because qualified immunity, which "is an *immunity from suit*, rather than a mere defense to liability . . . is effectively lost if a case is erroneously permitted to go to trial." *Id.* In other words, the district court's denial of qualified immunity at summary judgment "finally and conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations." *Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir. 2009).

By contrast, this Court "can effectively review" whether Section 1997e(e) bars Fugate's Eighth Amendment claim "after a final judgment." *Himmelreich*, 5 F.4th at 663. Erdos's own cases illustrate that. In *Hoever v. Marks* (cited at Opening Br. 45), the Eleventh Circuit ruled on Section 1997e(e)'s scope after a "three-day" jury trial. 993 F.3d 1353, 1355 (11th Cir. 2021) (en banc). And this Court issued its Section 1997e(e) holding in *Harden-Bey v. Rutter* (cited at Opening Br. 44) only after the district court dismissed plaintiff's case and issued final judgment. 524 F.3d 789, 790-791 (6th Cir. 2008).

Section 1997e(e) is not an "immunity from suit; it is a defense to liability." *DeCrane*, 12 F.4th at 601-602 (holding no interlocutory jurisdiction to review statue-of-limitations defense); *see also Himmelreich*, 5 F.4th at 662 (no interlocutory jurisdiction to consider arguments unrelated to defendant's "entitlement not to stand trial"). Section 1997e(e) concerns the "[l]imitation" of a *plaintiff's* "recovery," without ever mentioning a *defendant*, much less the defendant's immunity. 42 U.S.C. § 1997e(e).[9] Accepting Erdos's argument would "swallow the general rule"

---

[9] Erdos asserts that the District Court's ruling on Section 1997e(e) was part of its "den[ial]" of qualified immunity. Opening Br. 43. That is incorrect. The District Court's Section 1997e(e) ruling was presented under its own heading, "The Eighth Amendment and Cognizable Injury," and analyzed separately from the preceding qualified immunity discussion. *See* SJ Order, R.89, PageID## 1342-1343. This Court lacks interlocutory jurisdiction to consider arguments simply because they "arose from the same order" denying qualified immunity. *DeCrane*, 12 F.4th at 601.

that "a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Himmelreich*, 5 F.4th at 659 (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)).

B. Regardless, Erdos's position lacks merit. Erdos essentially asks this Court to rule that "Section 1997e(e) precludes compensatory damages for *any* claim that does not include physical harm." *Aref v. Lynch*, 833 F.3d 242, 262 (D.C. Cir. 2016). This Court, however, has already joined the Seventh and D.C. Circuits to "take[] the opposite approach." *Id.* at 263 (discussing *King v. Zamiara*, 788 F.3d 207 (6th Cir. 2015)). In *King v. Zamiara*, this Court held that because "constitutional injuries" are distinct from "mental and emotional injuries," the statute does not bar plaintiffs from "recover[ing] compensatory damages for the violation of his First Amendment rights." 788 F.3d at 212-213. And this Court recently reaffirmed (without expressly deciding) that *King*'s "logic would seem to apply" in the Eighth Amendment context. *Small v. Brock*, 963 F.3d 539, 543-544 (6th Cir. 2020) (citing *Lucas v. Chalk*, 785 F. App'x 288, 292 (6th Cir. 2019)).[10]

---

[10] *Small* and *Lucas* thus undercut Erdos's argument that *King* is inapplicable because it "involve[d] a First Amendment" claim. Opening Br. 45. Erdos's reliance (at Opening Br. 44) on *Harden-Bey v. Rutter*, 524 F.3d 789 (6th Cir. 2008) is also misplaced. *Rutter* held that Section 1997e(e) prevents recovery for "emotional or mental injuries." 524 F.3d at 795. But Fugate brought claims to "redress constitutional injuries, which are distinct from mental and emotional injuries." *King*,

Even if *King* were strictly a First Amendment case, Fugate could still bring his Eighth Amendment claim for *punitive* damages—the District Court's alternative reasoning, which Erdos does not even acknowledge. SJ Order, R.89, PageID# 1343 (citing *Small*). In *Small*, this Court read its own case law to suggest that "1997e(e) allows prisoners to seek nominal and punitive damages, as well as injunctive relief, for alleged Eighth Amendment violations." 963 F.3d at 543 (citing *Lucas*, 785 F. App'x at 292); *see also Aref*, 833 F.3d at 263 (recognizing every circuit to have decided the question allows "claims for injunctive relief and punitive damages to proceed" under Section 1997e(e)).

This Court lacks interlocutory jurisdiction to consider Erdos's Section 1997e(e) merits defense. But if it does decide the merits, it should allow Fugate's Eighth Amendment claim for both compensatory and punitive damages to proceed.

---

788 F.3d at 213; *see* Complaint, R.3, PageID# 50 (seeking compensatory and punitive damages for the "violation of 8th Amendment right").

## CONCLUSION

This Court should either dismiss the appeal for lack of jurisdiction or affirm the District Court's denial of summary judgment.


March 10, 2022

Oren Nimni
RIGHTS BEHIND BARS
416 Florida Ave. NW, #26152
Washington, DC 20001
oren@rightsbehindbars.org

Respectfully submitted,

/s/ Matthew J. Higgins
Catherine E. Stetson
Matthew J. Higgins
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Phone: (202) 637-5889
Fax: (202) 637-5910
matthew.higgins@hoganlovells.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,982 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in Times New Roman 14-point font.

March 10, 2022                              /s/ Matthew J. Higgins
                                           Matthew J. Higgins
                                           HOGAN LOVELLS US LLP
                                           555 Thirteenth Street, NW
                                           Washington, DC 20004
                                           Phone: (202) 637-5889
                                           matthew.higgins@hoganlovells.com

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on March 10, 2022.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


March 10, 2022                    /s/ Matthew J. Higgins
                                  Matthew J. Higgins
                                  HOGAN LOVELLS US LLP
                                  555 Thirteenth Street, NW
                                  Washington, DC 20004
                                  Phone: (202) 637-5889
                                  matthew.higgins@hoganlovells.com

## DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

| R. | Document Description | PageID# |
|---|---|---|
| 3 | Complaint | 40-59 |
| 54-1 | Fugate Photograph | 273-274 |
| 54-1 | Whitman E-mail | 284 |
| 61-3 | Use of Force Report | 509-595 |
| 61-4 | Erdos Declaration 1 | 596-599 |
| 61-9 | Felts Declaration | 609-610 |
| 61-10 | Eshem Declaration | 611-613 |
| 73-1 | Erdos Declaration 2 | 1108 |
| 78-1 | Fugate Deposition | 1132-1227 |
| 80 | Report & Recommendation | 1234-1264 |
| 89 | SJ Order | 1331-1345 |
| 90 | Notice of Appeal | 1346-1347 |